**Cyntha J. RESARE, Plaintiff, Appellant,**

v.

**RAYTHEON COMPANY, Etc., Defendant, Appellee.**

**No. 92–1260.**

United States Court of Appeals, First Circuit.

Heard Oct. 6, 1992.

Decided Dec. 10, 1992.

Robert B. Mann, with whom Mann & Mitchell, Providence, R.I., were on brief for plaintiff, appellant.

Michael P. DeFanti, with whom Douglas A. Giron and Hinckley, Allen, Snyder &

Comen, Providence, R.I., were on brief, for defendant, appellee.

Before TORRUELLA, Circuit Judge, BROWN,[*] Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

After a two-day trial on plaintiff Cyntha J. Resare's sex and age discrimination claims, the district court granted defendant Raytheon Company's motion for judgment as a matter of law on plaintiff's sex discrimination claims under both the Rhode Island Fair Employment Practices Act ("FEPA"), R.I.Gen.Laws §§ 28–5–1 *et seq.* (Supp.1991), and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I.Gen. Laws § 42–112–1 *et seq.* (Supp.1991).[1] During the trial, the district court also ruled that evidence of compensatory damages, absent corroborating medical testimony, was not allowed under R.I.Gen.Laws § 28–5–24(2) (Supp.1991). Subsequently, the Rhode Island legislature amended FEPA in several relevant respects. Relying upon these amendments, plaintiff now contends that the district court's rulings cannot stand. For the reasons outlined below, we affirm in part and reverse in part.

## I.

### STANDARD OF REVIEW

In reviewing a district court's decision to grant a defendant's motion for judgment as a matter of law, *see* Rule 50, Fed.R.Civ. P.,[2] "we examine the evidence and all fair inferences in the light most favorable to the plaintiff." *Richmond Steel Inc. v. Puerto Rican American Ins. Co.*, 954 F.2d 19, 22 (1st Cir.1992). To affirm the with-drawal of any claim from the jury, we must find that, as a matter of law, the record would permit only one conclusion. *Id.* "We may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Id.* To warrant submission of an issue to the jury, the plaintiff must present "more than a mere scintilla" of evidence and may not rely on conjecture or speculation. *Id.* Instead, "the evidence offered must make the 'existence of the fact to be inferred more probable than its nonexistence.'" *Id.* (quoting *Carlson v. American Safety Equip. Corp.*, 528 F.2d 384, 386 (1st Cir. 1976)).

## II.

### BACKGROUND

On March 23, 1987, after having spent almost ten years as a United States government attorney specializing in the procurement, termination, and interpretation of defense contracts, plaintiff Cyntha Resare was hired by defendant Raytheon Company ("defendant" or "company") to join its Portsmouth, Rhode Island, Submarine Signal Division. Defendant's primary business is the design and manufacture of sonar devices and submarine missile firing controls. Like many defense contractors, defendant experienced a growth in business and in number of employees throughout the early 1980's. At the time it hired plaintiff, defendant had approximately 3,300 employees.

At all relevant times, plaintiff worked in the Materials Management department of the company, which contained six separate subdivisions.[3] Plaintiff worked in the Policy and Planning subdivision. Her immedi-

---

[*] Of the Fifth Circuit, sitting by designation.

1. The district court denied defendant's motion for judgment as a matter of law on plaintiff's age discrimination claim, and the jury returned a verdict in favor of the defendant on that claim. Plaintiff does not contest the age discrimination verdict in this appeal.

2. Fed.R.Civ.P. 50(a)(1) provides:

   If during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

3. Only two of the six subdivisions are relevant to this lawsuit: (1) Subcontracts; and (2) Procurement, Policy and Planning ("Policy and Planning").

ate supervisor was Richard A. Elliott, the manager of that subdivision.[4] Elliott's immediate supervisor was Charles F. O'Donnell, the manager of the Materials Management department. O'Donnell reported to Barry R. Steiner, the company's manufacturing manager.

Plaintiff was hired as a "Subcontract Specialist" to assist Elliott. On the personnel grading scale, plaintiff was classified as a "salary grade level 9." The Policy and Planning subdivision consisted of Elliott, plaintiff, and a clerical assistant. Although plaintiff worked in Policy and Planning, her job included overseeing, working closely with, and training employees in several of the other subdivisions in the Materials Management department. The record reflects that plaintiff worked particularly closely with employees in Subcontracts.[5] In addition to training and overseeing other employees, plaintiff reviewed numerous contracts and subcontracts for compliance with government regulations, helped to reestablish the company's "certified purchasing system" after it failed a government audit, and advised company employees on contract negotiation and procurement issues.

No one disputes that plaintiff was an excellent employee. At her one-year review, in March 1988, Elliott listed her strengths: "(1) exceptional oral and written communications [skills;] (2) effective human relations skills[;] (3) solid negotiation skills[;] (4) significant knowledge and experience in contracting[; and] (5) well developed teaching skills[.]" Following this review, defendant gave plaintiff a raise. Dissatisfied with the amount of her raise, plaintiff complained to O'Donnell, Elliott's immediate supervisor. According to plaintiff, O'Donnell recommended speaking with Elliott about the possibility of receiving a promotion and further salary increase through reclassification of her job title.

Plaintiff also testified that, during the same discussion, she informed O'Donnell of her interest in applying for the position of manager of Subcontracts as soon as the position became available. Evidence at trial revealed, however, that when that position did become available, the company did not advertise it, no one in the company ever approached plaintiff about applying for it, and ultimately, the position was filled by a man named Don M. Lynch. Elliott testified that as a former manager of Subcontracts and as someone who worked closely with plaintiff, he considered her qualified for the position.

At trial, O'Donnell flatly denied that he had ever discussed with plaintiff either her dissatisfaction with her raise or her interest in the managerial position. When asked whether he had considered plaintiff for the position, O'Donnell responded:

A: No, I did not.

Q: Why is that?

A: Because the problem that I was faced with was a management problem. Ms. Resare and her background, in her resume and all my knowledge of her experience, never held the position of [s]upervisor or [m]anager. I was trying to fix a management problem, and I needed an experienced [m]anager to solve the problem.

Q: Did you consider the fact that she had supervised attorneys before?

A: No, I didn't.

Q: Did you in fact before you filled the position look at her resume?

A: No, as I mentioned, I never really gave her consideration because of her lack of experience as a [m]anager in industry.

The following year, in March 1989, plaintiff received another positive review. After this review, her job classification was upgraded to "Procurement Contracts Advisor," which entitled her to a "grade level

---

4. Prior to serving as the manager of Policy and Planning, Elliott served for fifteen years as the manager of Subcontracts.

5. In the Subcontracts subdivision, there were three levels of employees: (1) "Subcontract Specialists" (salary grade level 9); (2) "Senior Sub-

contract Administrators" (salary grade level 8); and (3) "Subcontract Administrators" (salary grade level 7). According to defendant, it "borrowed" plaintiff's "Subcontracts Specialist" job classification and grade level from the Subcontracts subdivision.

10" and a substantial raise. Despite the new job classification, plaintiff continued to do the same type of work she had done as a Subcontract Specialist.

Meanwhile, business at the company was declining. In late fall of 1989, O'Donnell received instructions from Steiner, his immediate supervisor, to reduce the Materials Management department budget by "four or five hundred thousand dollar[s]." During this first round of budget cuts, defendant did not consider discharging plaintiff.

In early January 1990, the company did not "win" a contract for which it had competed, and Steiner decided that further layoffs in the Materials Management department were necessary. According to

6. The company referred to its expenses as either "overhead" or "direct charge." This distinction operated as an accounting device by which the company billed the government for its work. According to O'Donnell, an employee on a "direct charge" assignment was able to bill her/his time directly to a specific government contract. In contrast, an employee on an "overhead" assignment could not bill her/his time to a specific contract but simply billed to the "overhead" budget. *O'Donnell further explained that employees were not labeled by the company as either "overhead" or "direct charge" employees. Instead, the company had the discretion, under each government contract, to determine who did "direct charge" billing. O'Donnell admitted that there was nothing which precluded plaintiff from working on "direct charge" assignments.*

7. In contrast, Steiner testified that *he* added plaintiff's name to a layoff list O'Donnell proposed in this second round of layoffs. According to Steiner, he decided that Elliott could work alone in Policy and Planning, as Elliott had done prior to plaintiff's arrival. Steiner testified: "I told Chuck O'Donnell that, unfortunately, even though Cynth was doing an excellent job, we couldn't afford to keep her any longer." Steiner then described O'Donnell as objecting to *Steiner's* suggestion to add plaintiff's name to the layoff list.

When asked a series of questions at trial *about how he reached the decision that plaintiff should be laid off*, Steiner revealed that he knew very little about plaintiff before allegedly suggesting her name to O'Donnell:
Q: [O'Donnell] was the only person from whom you received input on the question of whether or not to keep [plaintiff] on the job, right?
A: He's a direct report to me, so, yes, sir.
Q: Before the decision was made to terminate her, you did not look at her resume at all, did you?
A: No.

O'Donnell, in "the first or second week of January[,]" Steiner instructed him to reduce "overhead expense[s]"[6] by approximately $470,000. O'Donnell testified that he placed plaintiff's name on the layoff list during this second round of budget cuts.[7]

O'Donnell testified that at some point *after* he placed plaintiff's name on the list of layoffs which he presented to Steiner, he sent a memorandum to Steiner asking that his budget be enlarged so that he could retain plaintiff.[8] In this memorandum, which was entitled "The Senseless Loss of a Unique Division Resource," O'Donnell detailed plaintiff's "outstanding" employment history with the company and included the following entreaty to Steiner:

Q: Did you look at her job evaluations or anything else before the decision was made to terminate her?
A: No, sir.
Q: Did you ask [O'Donnell] whether or not there were other people in the Materials Department whose termination would save an equal amount of money and still allow the same amount of work to be done?
A: No, I didn't.
Q: Did you look at the resumes or any job performance papers or any other documents concerning the work of either Mr. Pagliaro, Mr. Roncka, or Mr. Hitchcock in the Materials Department?
A: No, I didn't.
Q: Did you ask [O'Donnell] whether or not Ms. Resare could do the work of a subcontract specialist as well as, did you ask him that question?
A: No, sir.
Q: Did you know whether she could do the work of a subcontract specialist?
A: I don't believe I did.
Q: Did you speak with Mr. Elliott about whether or not he would be able to do all the work that was now being done by Ms. Resare with her separation?
A: No, I didn't ask him....
Q: Did Mr. O'Donnell ever discuss with you the option of terminating someone instead of Ms. Resare?
A: No, I don't recall that he ever did that.

8. Steiner testified that O'Donnell returned to him "a day or two after" their meeting with a memorandum requesting that plaintiff be retained. When asked how he would characterize the degree of support O'Donnell voiced for plaintiff, Steiner testified: "The degree of support was over and above anything I have seen from him before. It was extraordinary because of the memo he wrote."

Having said all of the above, why then is Cyntha Resare going to be laid off? Because of load-to-no-load accounting legerdemain, is there a reduction in the need for the valuable services she provides? Is buyer training in FAR regulations, contract law negotiating tactics, ethics, dispute avoidance and resolution no longer necessary? Obviously, the answer to these questions is no. The plain truth as to why Cyntha Resare is being laid off is that she must be included in the body count in order to make "the number." Part of an additional $600K of reduced expenses on top of the $500K that has already been reduced from 1989 actuals of controllable costs.

What is senseless about all of this is that you and I both know that despite all of the reduced costs, there is virtually no chance that 12.6 percent can be met at year end as more contracts later in the year slip to the right or are lost. So what have we accomplished?

We can say truthfully that we followed directions and took immediate massive, additional cost reductions (Beyond what we think is reasonable), but AT WHAT PRICE?

Despite this grandiloquent plea to keep plaintiff,[9] plaintiff was laid off on March 27, 1990, along with four other employees in the Materials Management department. On February 25, 1991, plaintiff brought suit in state court alleging, *inter alia,* sex discrimination under two state law causes of action. Asserting diversity of citizenship, defendant removed the case to federal court. The case was then tried before a jury.

At trial, plaintiff proffered evidence from which a jury could have concluded that O'Donnell harbored sexist attitudes. For example, Elliott testified that O'Donnell was a "sexist."[10] When asked how he came to know this about O'Donnell, Elliott stated: "Well, there was a great deal of loose talk, much of which described the

female anatomy and it was detrimental to women. So it was my opinion that [O'Donnell's] attitude was highly sexist." When asked if he could remember specific examples of O'Donnell's "loose talk," Elliott stated:

A: Well, when referring to a woman by the name of Pat Pelletier, he, at a going-away function, he indicated to her that the thing he would miss most about her was the fact that she had legs all the way to her ass....

Q: Do you remember any other specific comments Mr. O'Donnell made about specific women in terms of, you said he made lots of comments, but do you remember any other specific ones he made about specific women?

A: The only ones that I can recall at this point in time is that he indicated that a lot of men wanted to sit next to and be next to Heather MacDonald because she had large breasts.

Pat Pelletier, a former employee of the Materials Management department, testified that after nine and one-half years of service to the company, she was honored at a going-away party with a speech by her immediate supervisor. In that speech, her supervisor thanked her for the work she had done and said that she would be missed by the company. Following this speech, O'Donnell then made a few remarks. When asked what O'Donnell had said, Pelletier testified:

A: I don't remember everything [O'Donnell] said. I just remember the last thing he said.

Q: What was that?

A: He said that the thing that they would miss most about Pat were her legs, they were so long they went, nobody knew where they ended, they went up, and I don't know what he said after that.

Q: And how did you feel about those comments?

**9.** O'Donnell did not deny at trial that, when asked during his deposition to detail the steps he took to keep plaintiff's job, he failed to mention the January 31, 1990, memorandum.

**10.** At the time of trial, Elliott reported directly to O'Donnell and had worked at the company for approximately twenty-three years.

A: At that particular time, I was embarrassed.

Carol Stewart, a three year former employee of the company, also witnessed and corroborated O'Donnell's speech about Pelletier:

Q: Do you remember what [O'Donnell] said?

A: Yes, I do.

Q: What did he say?

A: The comment that stopped the party cold was that Pat Pelletier had legs all the way from her ass to the ground.

Plaintiff corroborated Elliott's testimony about O'Donnell's remarks concerning Heather MacDonald's breasts:

Q: Who is Heather MacDonald?

A: Heather MacDonald was a buyer in Purchasing which is in the Materials Department.

Q: Did you ever hear Mr. O'Donnell say anything about Heather MacDonald?

A: Yes, sir.

Q: What did you hear him say?

A: I heard Mr. O'Donnell make remarks about Heather to the effect that he and everybody else liked to get close to Heather because Heather had very large breasts. That's not the terminology he used, but.

Q: What was the terminology he used?

A: Boobs.

Q: How often did you hear him say this?

A: I personally heard him say that at least twice in public, not in his office, just talking to people.

Heather MacDonald, a former employee who had worked at the company for approximately eight years, testified that she remembered O'Donnell approaching her at a company softball game and asking: "Gee, when are they going to have the wet t-shirt contest?"

O'Donnell denied that he ever made comments about Heather MacDonald's breasts, and testified that he did not recall making a speech at Pat Pelletier's going-away party. He then admitted, however, that he made the "wet t-shirt" comment to Heather MacDonald at a company softball game.

Plaintiff also testified that she and several other women in the Materials Management department once had requested that O'Donnell give them permission to attend a seminar in Providence dealing with the general topic of professional women in business. According to plaintiff, O'Donnell asked all of the women who had made the request to come to his office. He then denied their request and said that he wanted to know if "this was a woman's libber movement or something" and that he "thought since he had promoted Pat Pelletier, that he showed that he took care of woman all right. . . ." O'Donnell denied having made the "woman's libber" statement and testified that he simply refused to allow the women to go to the meeting on company time.

In addition to the evidence that O'Donnell made disparaging and sexist remarks about female employees within his department, there was also evidence that, at the time plaintiff was laid off, three men in Subcontracts who were hired after plaintiff and who had salary grade levels lower than plaintiff's (Mr. Hitchcock, hired 10/87; Mr. Roncka, hired 7/88; Mr. Pagliaro, hired 11/88) were retained. The evidence showed that plaintiff was qualified to do the work of all three of these men and, in fact, had been supervising them prior to her layoff. At the time of plaintiff's discharge, the monthly salaries of the four employees were as follows: (1) plaintiff $4,860; (2) Hitchcock $4,460; (3) Roncka $4,475; (4) Pagliaro $4,885.

Defendant's explanation at trial for plaintiff's layoff was threefold: (1) the loss of the large contract in early 1990; (2) the resulting need to trim the "overhead" budget which, according to defendant, was accomplished by eliminating plaintiff's job but could not be accomplished by laying off any one of the three junior men in the Subcontracts subdivision; and (3) the company's inability to discharge one of the three men in Subcontracts because of a long-standing "no-bumping" policy.[11]

11. According to defendant, the "no-bumping" policy prohibits the company from laying off a

After two days of trial, the district court granted defendant's motion for judgment as a matter of law on both of plaintiff's sex discrimination claims. In so holding, the court ruled that plaintiff failed to produce sufficient evidence of sex discrimination under either FEPA or RICRA. During the trial, the district court also ruled that plaintiff needed medical evidence of physical injury to prove her compensatory damages under FEPA. This appeal challenges those rulings. We address each in turn.

### III.

### DISCUSSION

A. *Motion for Judgment as a Matter of Law on Plaintiff's Sex Discrimination claim under FEPA*

At the outset, we note that—despite the confusion in the record over this question— it is apparent that plaintiff brought her FEPA claim of sex discrimination under two separate sections of the statute. *See* FEPA §§ 28–5–7(1)(A)–(B); 28–5–7.3.[12] As a result, we address the viability of plaintiff's FEPA claim under each section.

1. Plaintiff's "mixed-motive" claim under FEPA

■ In his January 29, 1992, bench ruling, the district judge withheld plaintiff's claim of sex discrimination from the jury because he found both that § 28–5–7.3 required "direct evidence" of sex discrimination and that plaintiff had not presented any such evidence. Relying upon a recently enacted amendment to FEPA, plaintiff argues that this ruling was erroneous and should be reversed.[13] We agree with plaintiff's contention.

It is well settled under both federal and Rhode Island law that where legislative intent as to the retroactivity of a statute is manifest, that intent is controlling. *See, e.g., Kaiser Alum. & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990); *Richtmyer v. Richtmyer,* 461 A.2d 409, 411 (R.I. 1983). Where a statute is amended while a case is on direct review, and the statute dictates that it shall be applied to "pending" actions, the Rhode Island Supreme Court has applied the amended version of the statute to the case. *See Spunt v. Oak Hill Nursing Home, Inc.,* 509 A.2d 463, 465 (R.I.1986); *Pezzulli v. State,* 494 A.2d

---

less senior employee with a specific job classification to make room for a higher seniority employee with a different job classification.

**12.** FEPA § 28–5–7(1)(A)–(B) provides in relevant part:

It shall be an unlawful employment practice ... [f]or any employer ... [t]o refuse to hire any applicant for employment because of his or her ... sex ... or ... [b]ecause of such reason[ ], to discharge an employee....

At the time of trial, FEPA § 28–5–7.3 provided:

An unlawful employment practice is established in an action or proceeding under this chapter when the complainant demonstrates that ... sex ... was a motivating factor for any employment practice, even though such practice was also motivated by other factors.

Borrowing from federal law, we will refer to plaintiff's claim under § 28–5–7.3 as her "mixed-motive" claim, and her § 28–5–7(1)(A)–(B) claim as her "pretext" claim. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 247 n. 12, 109 S.Ct. 1775, 1789 n. 12, 104 L.Ed.2d 268 (1989) ("Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a "pretext" case or a "mixed-motives" case from the beginning in [d]istrict [c]ourt;

indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both."). *See also Newport Shipyard Inc. v. Rhode Island Comm'n for Human Rights,* 484 A.2d 893, 897–98 (R.I.1984) (acknowledging § 28–5–7(1) as the statutory source of a "pretext" claim of discrimination under FEPA).

**13.** During the pendency of this appeal, the Rhode Island legislature amended § 28–5–7.3 in the following manner:

An unlawful employment practice **may be** established in an action or proceeding under this chapter when the complainant demonstrates that ... sex ... was a motivating factor for any employment practice, even though such practice was also motivated by other factors. **Nothing contained herein shall be construed as requiring direct evidence of unlawful intent or as limiting the methods of proof of unlawful employment practices under section 28–5–7.**

1992 R.I.Pub.Laws, ch. 447, § 1 (effective July 14, 1992) (also referred to as the "'mixed-motive' amendment"). Section 2 of the "mixed-motive" amendment further provides that it "shall take effect upon passage and shall apply to all pending cases."

540, 542–43 (R.I.1985); *Richtmyer*, 461 A.2d at 411. *See also United States v. 1002.35 Acres of Land*, 942 F.2d 733, 736 (10th Cir.1991) ("Where ... Congress expressly provides ... that a statute 'shall apply to cases pending on or commenced on or after the date of the enactment,' courts have no choice but to follow its dictates.") ("A case is a 'pending' one ... if an appeal on the merits was pending when the [a]mendments were enacted.").

In light of these precepts, it is evident that the amendment applies to plaintiff's claim. In its "mixed-motive" amendment, the Rhode Island legislature made manifest its intention that the statute "shall apply to all pending cases." *See* 1992 R.I.Pub. Laws, ch. 447, § 2. As this direct appeal was pending when the amendment became law, we must therefore give the amendment retroactive effect. And, as the amendment makes clear, "direct evidence" is not required in a "mixed-motive" sex discrimination case. *See* 1992 R.I.Pub. Laws, ch. 447, § 1. As such, plaintiff does not need "direct evidence" to get her claim before a jury.

■ Defendant argues, however, that even under the "mixed-motive" amendment, plaintiff did not make out a sufficient case of sex discrimination. We disagree.

■ To make out a claim under the new statute, a plaintiff must show that it is more likely than not that her/his sex was "*a* motivating factor[,]" *see* 1992 R.I.Pub. Laws, ch. 447, § 1 (emphasis supplied), in the adverse employment decision. Further, a plaintiff can satisfy her/his initial burden *without* "direct evidence" that sex animus

entered into the decisional calculus. *See id.* Thus, in determining whether a "mixed-motive" claim survives a motion for judgment as a matter of law, a court must determine whether the plaintiff has put forth sufficient evidence for a jury to conclude that it is more likely than not that the plaintiff's sex was "a motivating factor" for the defendant's employment decision.[14]

In the instant case, plaintiff presented the following evidence in an effort to prove that her sex was "a motivating factor" in defendant's decision to terminate her:

(1) testimony tending to show that O'Donnell was the *de facto* decision-maker;

(2) O'Donnell's admission that he had "some discretion" over exactly how to reduce his budget;

(3) O'Donnell's testimony that he chose to lay off plaintiff rather than three less senior male employees, one of whom had a higher salary than plaintiff;

(4) O'Donnell's testimony that he selected plaintiff for layoff because she was part of his "overhead" budget (whereas the three less senior male employees were part of the "direct charge" budget), in contrast to his admission, when pressed at trial, that he did not know how much of plaintiff's work could be categorized as "overhead" and/or "direct charge";[15]

(5) O'Donnell's testimony that the company's "no-bumping" policy precluded him from laying off one of the less senior male employees in Subcontracts, in contrast to other testimony which showed that plaintiff was qualified to assume their responsibilities and could have re-

---

**14.** We note that, when compared to federal law in existence prior to the enactment of the Civil Rights Act of 1991, the new Rhode Island statute places fewer obstacles in the way of a plaintiff alleging a "mixed-motive" case of sex discrimination. *Compare* 1992 R.I.Pub.Laws, ch. 447, § 1 *with Price Waterhouse*, 490 U.S. at 237–58, 109 S.Ct. at 1783–95 (outlining the burden-shifting framework for a "mixed-motive" claim of sex discrimination under federal law) (requiring plaintiff to prove that it is more likely than not that sex animus played a part in employment decision; if plaintiff satisfies that burden, the defendant must then prove that it would have

made the same decision absent the sex animus); *Jackson v. Harvard Univ.*, 900 F.2d 464, 467 (1st Cir.) (interpreting *Price Waterhouse* as requiring plaintiff to prove with "direct evidence" that sex animus played a part in employment decision), *cert. denied*, —— U.S. ——, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990).

**15.** In its brief, defendant asserts that "[t]he federal government would not pay for [plaintiff's position] on a direct charge basis." O'Donnell testified at trial, however, that he was unaware of any such rule or agreement.

ceived the type of "direct charge" assignments for which they were responsible; (6) the testimony of several witnesses that O'Donnell harbored and was wont to express sexist attitudes in the workplace.[16]

Viewing the sum total of this evidence and its reasonable inferences in a light most favorable to plaintiff, we find that a jury could have concluded that it was more likely than not that plaintiff's sex was *a* motivating factor in defendant's decision to terminate her. We therefore reject defendant's argument that, even under the "mixed-motive" amendment, plaintiff failed to put forth sufficient evidence to withstand its motion for judgment as a matter of law.[17]

### 2. Plaintiff's "pretext" claim under FEPA

■ The district court also ruled that plaintiff did not put forth sufficient evidence to make out a "pretext" claim of sex discrimination under FEPA.[18] For the following reasons, we disagree with the district court's decision.

■ A Rhode Island plaintiff alleging that sex discrimination infected an employer's decision to discharge her/him can proceed under either § 28–5–7.3 ("mixed-motive" theory) or § 28–5–7(1)(A)–(B) ("pretext" theory).[19] While the Rhode Island legislature amended § 28–5–7.3, that amendment does not appear to alter the analytical framework of a "pretext" claim under § 28–5–7(1)(A)–(B).[20] Thus, a plaintiff whose evidence is insufficient to show that her/his sex was "a motivating factor" in defendant's employment decision can attempt to prove her/his case under a "pretext" theory of discrimination. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) (explaining the "pretext" burden-shifting framework). *See also Newport*, 484 A.2d at 898–99 (applying the *McDonnell Douglas* to a claim under § 28–5–7(1)(A)–(B)).

■ Under the now familiar *McDonnell Douglas* tripartite burden-shifting analysis, a plaintiff must first make out a prima facie case of sex discrimination. *Fields v. Clark Univ.*, 966 F.2d 49, 51 (1st Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3383 (U.S. Nov. 9, 1992) (No. 92–809); *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir.1990). The burden placed on a plaintiff at this stage "is not onerous." *Fields*, 966 F.2d at 51 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). In a "reduction in force" case, a plaintiff can make out

---

16. The record also contains a memorandum dated January 31, 1990, from O'Donnell to Steiner, which defendant introduced at trial to prove O'Donnell's commitment to plaintiff. Plaintiff, however, introduced the following evidence to cast doubt on the facially exculpatory nature of this memorandum:

(a) O'Donnell allegedly wrote the memorandum shortly *after* he had suggested to Steiner that plaintiff's name be placed on the list of layoffs;

(b) O'Donnell's hyperbolic praise for plaintiff in the memorandum, ("A Senseless Loss of a Unique Division Resource"), stands *alone* in the record as evidence that O'Donnell held plaintiff in such high esteem (and may be inconsistent with his admitted failure at an earlier time to give her any consideration for a promotion for which her immediate supervisor considered her qualified); and

(c) O'Donnell did not deny that, when asked at his deposition what steps he took to retain plaintiff, he failed to mention the memorandum.

17. Because we decide this issue under the recently amended version of § 28–5–7.3, we need not address the question of whether a motion for judgment as a matter of law was warranted under the pre-amendment version of the statute.

18. The bench ruling below does not make clear the grounds upon which the court relied in granting defendant's motion for judgment as matter of law on plaintiff's "pretext" claim.

19. As we previously noted, oftentimes a plaintiff alleging sex discrimination will proceed under both of these statutes. *See supra* note 12.

20. Indeed, the amendment's language highlights the fact that a "mixed-motive" theory of discrimination is merely one way in which a plaintiff can prove "an unlawful employment practice." *See* 1992 R.I.Pub.Laws, ch. 447, § 1 ("An unlawful employment practice *may be* established ... when the complainant demonstrates that ... sex ... was a motivating factor....") (emphasis supplied).

a prima facie case by showing that: (1) s/he is in the protected class; (2) s/he performed her/his job adequately; (3) s/he was nevertheless dismissed; and (4) the employer did not treat sex neutrally or that opposite sex employees doing the same or similar work were retained. *Cf. Connell v. Bank of Boston,* 924 F.2d 1169, 1173 n. 5 (1st Cir.) (age discrimination), *cert. denied,* — U.S. —, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991); *Schuler v. Polaroid Corp.,* 848 F.2d 276, 278 (1st Cir.1988) (same).[21]

Once the prima facie case is established, an inference of discrimination arises. *Cumpiano,* 902 F.2d at 153. Next, the burden of production, not persuasion, shifts to the defendant to articulate a plausible, legitimate, and nondiscriminatory justification for the discharge. *Fields,* 966 F.2d at 51; *Ramos v. Roche Products, Inc.,* 936 F.2d 43, 47 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991); *Cumpiano,* 902 F.2d at 153. Once the employer proffers such a justification, "'the inference raised by plaintiff's prima facie case vanishes.'" *Cumpiano,* 902 F.2d at 153 (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 9 (1st Cir.1990)). The plaintiff "must then carry her burden of proof by demonstrating that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

To satisfy this third prong, a plaintiff must do more than simply cast doubt upon the employer's justification. *Ramos,* 936 F.2d at 48. Rather, the plaintiff must prove that the employer's proffered justification was a pretext for sex discrimination. *Id.; cf. Lawrence v. Northrup Corp.,* 980 F.2d 66, 69 n. 1 (1st Cir.1992) (age discrimination) (explaining that, at the final stage of *McDonnell Douglas,* a plaintiff must come forward with "minimally sufficient evidence, direct or indirect, both of pretext

*and* of the employer's discriminatory animus") (emphasis in original).

To show pretext, a plaintiff must present evidence either that a discriminatory reason more likely motivated the employer or that the employer's justification is questionable or unworthy of belief. *See Fields,* 966 F.2d at 52. *See also Ramos,* 936 F.2d at 48 ("Pretext can be exposed in several different ways.... 'The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as pretext, if indeed it is one.'") (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979)); *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 347 (1st Cir.1989) ("To prove the proffered motive is not worthy of belief, evidence of a comparative sort is appropriate: if others were hired or promoted though by the same reasoning they ought to have been excluded, then the motive is a 'pretext.'") (quoting *Namenwirth v. Bd. of Regents,* 769 F.2d 1235, 1240 (7th Cir.1985), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986)), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

To prove the employer's discriminatory animus, a plaintiff is not required to come forward with evidence of the "smoking gun" variety. *Mesnick v. General Elec. Co.,* 950 F.2d 816, 824 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Rather, "there are many veins of circumstantial evidence that may be mined by a plaintiff to this end[,]" *id.,* including comments by decision-makers which denigrate women. *Cf. id.* (holding that "comments by decision-makers that denigrate those over forty" would be sufficient circumstantial evidence of animus in an age discrimination suit).

In assessing this evidence, a court must be mindful that its role "is not to second-guess the business decisions of an employer, imposing [its] subjective judgment[ ] of which person would best fulfill the respon-

---

**21.** In assessing the sufficiency of plaintiff's evidence at this stage, a court should keep its analytical eye focused on the central inquiry in a disparate treatment sex discrimination case: whether the employer treated "'some people less favorably than others because of their ... sex....'" *Thomas v. Digital Equip. Corp.,* 880 F.2d 1486, 1490 (1st Cir.1989) (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

sibilities of a certain job." *Rossy v. Roche Products, Inc.*, 880 F.2d 621, 625 (1st Cir. 1989). "While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination." *Id.* (quoting *Loeb*, 600 F.2d at 1012 n. 6). Finally, before granting a defendant's motion for judgment as a matter of law on a *McDonnell Douglas* claim, a court must be satisfied that no reasonable juror could find for plaintiff. *See Richmond Steel*, 954 F.2d at 22.

Here, plaintiff satisfied her initial burden of making out a prima facie case of sex discrimination. She is a member of the protected class; the evidence is undisputed that plaintiff was performing her job adequately when she was laid off in March 1990; and, there is evidence that males doing the same or similar work were retained.[22]

As plaintiff made out a prima facie case, the burden of production then shifted to defendant to articulate a legitimate, nondiscriminatory justification for discharging plaintiff. By coming forward both with evidence of necessary "overhead" budget cuts and with evidence that the company's longstanding "no-bumping" policy precluded it from laying off one of the three less senior male employees in Subcontracts, defendant more than adequately met that burden.

The proof pendulum then swung back to plaintiff. She was required to come forward with enough evidence to expose defendant's articulated justification as a pretext, or coverup, for sex discrimination. To satisfy this burden, plaintiff proffered evidence of both pretext and sex animus. First, on the question of pretext, the evidence revealed that, when making the selection to discharge plaintiff, O'Donnell did not know how much of her time was spent doing "overhead" work. O'Donnell also admitted at trial that he did not research the cost-saving potential of discharging one of the three less senior and, allegedly less qualified, male employees (including Mr. Pagliaro, who notwithstanding his lower salary grade level, received a higher salary than plaintiff). Further, evidence adduced at trial tended to show that the distinction between "overhead" or "direct charge" work was tied to specific assignments rather than individual employees, and that plaintiff was at least as qualified to do "direct charge" work as the three less senior male employees in the Subcontracts subdivision. Moreover, plaintiff's evidence raised at least a question of fact about whether defendant could have discharged one of the three less senior men in Subcontracts without violating its "no-bumping" policy.[23] Finally, on the question of sex animus, plaintiff proffered evidence that the decision-maker, O'Donnell, frequently made denigrating comments about women in the workplace.[24]

---

**22.** The record reveals that, until March 1989, plaintiff's official job title was "Subcontract Specialist." At some point during that month, plaintiff's job title was changed to a "Procurement Contracts Advisor." However, plaintiff testified that, despite her new job title, her day-to-day job description remained the same from the day she started until the day she was discharged. Plaintiff also presented evidence that three less senior male Subcontract Specialists, whose jobs she was qualified to perform, remained with the company after her discharge. Finally, evidence was adduced at trial which suggested that, although plaintiff was listed as a member of Policy and Planning, her work frequently spilled over into Subcontracts.

We think that the sum total of this evidence raises at least a question of fact about whether plaintiff and the three less senior male Subcontract Specialists retained by the company were doing similar work. In so holding, we are

mindful that the burden on a plaintiff at this stage is not an onerous one. *See, e.g., Fields*, 966 F.2d at 51.

**23.** For instance, it is not clear from the record whether defendant could have discharged Mr. Pagliaro and assigned plaintiff "direct charge" work (that would have otherwise been assigned to him) without violating its "no-bumping" policy. However, O'Donnell testified that, had defendant discharged Mr. Pagliaro and retained plaintiff, more "direct charge" work might have been available for plaintiff without a change in her job classification.

**24.** As for the January 31, 1990, memorandum from O'Donnell to Steiner, (which defendant offers as direct proof that O'Donnell's alleged sexism could not have infected his attitude toward plaintiff), we have previously noted plaintiff's attempt to discredit this facially exculpatory memorandum. *See supra* note 16.

Reviewing all of this evidence in a light most favorable to plaintiff, we find that a reasonable juror could reach a verdict for plaintiff on her "pretext" claim.[25] As a result, we reject defendant's argument that, under either a "pretext" or "mixed-motive" theory of sex discrimination, plaintiff did not put forth enough evidence to submit her claim to a jury.

### B. Exclusion of Plaintiff's Evidence of Compensatory Damages under FEPA

■ Plaintiff next challenges the district court's decision to exclude her nonphysical and nonmedical evidence of compensatory damages under R.I.Gen.Laws § 28–5–24(2).[26] Plaintiff's argument again rests upon a recent change in the law which, we find, supports her position.

At the same time that it amended its "mixed-motive" statute, § 28–5–7.3, the Rhode Island legislature also amended § 28–5–24(2). See 1992 R.I.Pub.Laws, ch. 447, § 1 (effective July 14, 1992). The amendment to § 28–5–24(2) added the following sentence: "The complainant shall not be required to prove that he or she has suffered physical harm or physical man-ifestation of injury in order to be awarded compensatory damages." See id. Further, as with the "mixed-motive" amendment, § 28–5–24(2)'s amendment applies "to all pending cases." See 1992 R.I.Pub. Laws, ch. 447, § 2.[27]

Based upon the amendment to § 28–5–24(2), therefore, plaintiff does not need evidence of physical harm to submit her claim for compensatory damages to a jury. Accordingly, the district court's ruling to the contrary cannot stand.[28]

### C. Motion for Judgment as a Matter of Law on Plaintiff's Sex Discrimination Claim under RICRA

■ Plaintiff's final argument is that the district court erred in granting defendant's motion for judgment as a matter of law on her sex discrimination claim under RICRA, R.I.Gen.Laws § 42–112–1 (Supp.1991) (effective July 10, 1990).[29] Defendant responds that, because the statute does not apply retroactively to its alleged discriminatory conduct (which occurred prior to RICRA's effective date), we should affirm the district court's ruling. We agree with defendant's argument.[30]

---

25. In so holding, we are aware that the record is devoid of *direct evidence* that O'Donnell's sexism infected his decision to select plaintiff for layoff. Under *McDonnell Douglas*, however, a plaintiff is not required to produce "smoking gun" evidence of the illegal discrimination. *See, e.g., Mesnick*, 950 F.2d at 824. Rarely, if ever, in fact, will a plaintiff employee have the kind of direct evidence that would, unassisted by inferences, raise the specter of sex discrimination. While we find the instant case a close one, we are satisfied—after reading the record in a light most favorable to plaintiff—that plaintiff came forward with enough evidence on her "pretext" claim to withstand defendant's motion for judgment as a matter of law.

26. At the time of trial, R.I.Gen.Laws § 28–5–24(2) provided:

If the commission finds that the respondent has engaged in intentional discrimination in violation of this chapter, the commission ... may award compensatory damages. As used in this section, the term 'compensatory damages' shall not include back pay or interest thereon....

27. As a result, our analysis of the retroactivity and applicability of the "mixed-motive" amend-ment applies equally to § 28–5–24(2)'s amendment. *See supra* pp. 39–40.

28. Because we decide this issue under the recent amendment, we need not address the question of whether the district court correctly interpreted the version of § 28–5–24(2) in effect at the time of trial.

29. R.I.Gen.Laws § 42–112–1(a) provides in relevant part that:

All persons within the state, regardless of ... sex ... shall have ... the same rights to make and enforce contracts
....
Subsection (b) further explains that:
[T]he right to "make and enforce contracts ..." shall include the making, performance, modification and termination of such contracts ... and the enjoyment of all benefits, terms and conditions of the aforesaid contractual ... relationship[ ].

30. In granting defendant's motion for judgment as a matter of law on plaintiff's RICRA claim, the district court reasoned that plaintiff's failure to come forward with sufficient evidence of sex discrimination under FEPA precluded a finding in her favor on her RICRA claim. On appeal,

 

Under Rhode Island law, statutes that create new substantive rights "are presumed to operate prospectively unless it appears by clear, strong language or by necessary implication that the Legislature intended to give the statute retroactive effect." *VanMarter v. Royal Indem. Co.,* 556 A.2d 41, 44 (R.I.1989). *See also Lawrence v. Anheuser-Busch, Inc.,* 523 A.2d 864, 869 (R.I.1987) (holding that substantive statutes "must be construed to operate prospectively" in the absence of strong language to the contrary); *Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 715 F.2d 10, 12 (1st Cir.1983) ("The Rhode Island cases consistently have required 'clear, strong language' expressing an intent to give a substantive statute retroactive effect before the presumption of prospective effect may be overcome.") (quoting *State v. Healy,* 122 R.I. 602, 410 A.2d 432, 434 (1980)).

Unlike the language in FEPA, RICRA contains no "clear, strong language" regarding retroactivity. In the absence of such language, we must therefore apply the presumption of prospectivity to this substantive statute. *See, e.g., VanMarter,* 556 A.2d at 44; *Lawrence,* 523 A.2d at 869. As a result, plaintiff's claim under RICRA must fail.[31] We therefore affirm, albeit on different grounds, the district court's decision to grant defendant's motion for judgment as a matter of law on plaintiff's RICRA claim.

## IV.

### CONCLUSION

For the reasons outlined above, the district court's decisions to grant defendant's motion for judgment as a matter of law on plaintiff's sex discrimination claim under FEPA and to exclude nonmedical evidence of her compensatory damages are *re-*

*versed,* and its ruling with respect to plaintiff's RICRA claim is *affirmed.*

*This case is remanded to the district court for proceedings consistent with this opinion.*

---

" '[w]e are ... free to affirm a district court's decision on any ground supported in the record even if the issue was not pleaded, tried or otherwise referred to in the proceedings below.' " *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 n. 8 (1st Cir.1990) (quoting *Norris v. Lumbermen's Mut. Casualty Co.,* 881 F.2d 1144, 1151–52

(1st Cir.1989)). *See also Mesnick,* 950 F.2d at 822 (similar).

**31.** We note that the fact that plaintiff filed her complaint after the effective date of RICRA does not alter our retroactivity analysis, which hinges instead on the date of the actionable conduct.