**CENTER FOR BEHAVIORAL HEALTH, RHODE ISLAND, INC.**

v.

**Judy L. BARROS et al.**

**No. 96–320–MP.**

Supreme Court of Rhode Island.

May 20, 1998.

Stephen C. Mackie, Providence, for Plaintiff.

Miriam Weizenbaum, Pawtucket, Amato A. DeLuca, Providence, Thomas J. Fay, Cynthia M. Hiatt, Providence/Christopher M. Mulhearn, Lynette J. Labinger, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case is before the Court on the petition of the Center for Behavioral Health, Rhode Island, Inc. (CBH or the center), for certiorari. The center seeks review of a judgment of the Superior Court affirming a

decision of the Rhode Island Commission for Human Rights (commission), which determined that CBH had engaged in discriminatory employment practices against Judy L. Barros (Barros), in violation of G.L.1956 § 28–5–7. For the reasons set forth below, we affirm the Superior Court judgment and dismiss CBH's petition.

## I

### Facts and Travel

Barros is a licensed practical nurse who had approximately twelve years' experience at the time she was hired by CBH, a methadone treatment clinic, in August of 1989. Barros was hired to fill the position of dispensary nurse, and her responsibilities included dispensing medication and collecting urine samples. As a condition of her employment Barros was required to complete CBH's standard three-month probationary term, which she did successfully. In November of 1989 and August of 1990, Barros received written evaluations in which her performance was rated "meets expectations" or "exceeds expectations" in every category. Specifically in the 1989 evaluation, Cheryl Hopkins (Hopkins), Barros' immediate supervisor, remarked that Barros was "a thoughtful, conscientious worker who shows an excellent rapport with both staff and clients." In the 1990 evaluation Hopkins further observed that Barros "is pleasant and conscientious, enjoying a good relationship with both staff and clients * * *. A pleasure to work with."

In the fall of 1990 CBH moved to a new location where it experienced a reduction in the number of its clients. As result CBH shifted the responsibilities of its entire staff. Hopkins, who had been assigned to dispensing medication with Barros, was removed from performing those duties, and Barros became solely responsible for dispensing the medication at the clinic. In conjunction with this increase in workload, Barros was awarded a pay increase in the amount of $0.25 per hour. Barros complained about the size of her pay increase to Hopkins and R. Ladd Underwood (Underwood), the Clinical Director of CBH. Underwood agreed to consult with the board of directors about an

additional raise. Thereafter, Underwood informed Barros that the board had denied her request for an increase in compensation.

In February of 1991 Barros informed both Hopkins and Underwood that she was pregnant and due in September of 1991. Barros inquired about CBH's maternity-leave policy and was told by Underwood that he was not aware of what the policy was but that he would find out and let her know. Underwood then asked when Barros would be returning to work following the birth of her child, to which question Barros replied that she could not presently provide him with any definitive answers. Approximately three weeks later, Underwood posed the same question to Barros, who was still unable to give him a specific date of return. She did indicate, however, that she intended to return to work at some point after the birth of her child. At no time was Barros ever informed by anyone of CBH's maternity-leave policies.

On April 15, 1991, Barros' brother was scheduled to appear for a bail hearing. Barros states that she learned the evening before that her presence would be required at the hearing and as a result she attempted to contact Hopkins to inform her that she would not be at work the next day. According to Barros, Hopkins' answering machine came on but Barros was not sure that it was working properly. In any event Barros maintains that she left a message and then called Underwood at home and spoke to him personally to ensure that the CBH staff was made aware of her anticipated absence.

Barros returned to work the day after the bail hearing and was called by Underwood into his office and told that her services at the clinic would no longer be needed. When Barros asked why she was being terminated, she was told by Underwood that she had a bad attitude, that she had difficulty getting along with the other members of the staff, and that contrary to Barros' prior assertions Hopkins had not received a message about her intended absence the day before.

On November 29, 1991, Barros filed a charge against CBH with the commission, alleging that CBH had discriminated against

her with respect to the terms and conditions of her employment and had terminated her because of race, color, and sex in violation of § 28–5–7. The commission conducted an investigation and concluded that no probable cause existed to support the allegation that in terminating Barros, CBH had been motivated by race or color. The commission did find, however, probable cause to believe the allegations that CBH had discriminated against·Barros on the basis of sex. Accordingly a notice of hearing and complaint issued on February 10, 1993.[1]

The hearings were conducted on August 30, 1993, and on October 20, 1993, at which time Hopkins and Underwood testified on behalf of CBH. Hopkins indicated that after Barros' raise was denied, she noticed a change in Barros' performance. According to Hopkins, Barros became unresponsive such that beginning in September of 1990, Hopkins made written notations regarding the difficulties she was having with Barros, including her reading the newspaper during work hours, presigning dosage cards, coming to work late, and failing to supervise urine screenings. Hopkins testified that she spoke with Barros on several occasions regarding these issues and that on two other occasions both Hopkins and Underwood met with Barros to discuss her job performance. Hopkins further testified that although she was home the night Barros allegedly phoned her to notify her of the impending absence, she never received any messages.

Hopkins admitted, however, that she never issued any written warnings to Barros because she thought Barros "had a possibility of changing her attitude." Hopkins testified that she was never consulted about the possibility of termination and was unaware that her superiors were contemplating it. The center's own employee manual was introduced at the hearing; it provides that "[i]f the employee's behavior, in the judgment of the employee's immediate supervisor and the Director, is of extreme severity, the Director will terminate employment of the employee." Hopkins conceded that she had no such discussions with Underwood.

When Underwood testified, he was asked about CBH employment policies and procedures. Underwood indicated that pursuant to the procedures outlined in the employee manual, the disciplinary actions are progressive in nature—an oral reprimand, which is the first warning that the behavior of an employee is unacceptable; written reprimand, which becomes a permanent part of the employee's file; probation, which is considered a severe warning issued in writing that explains clearly that action will be taken if certain deficiencies are not corrected within the probationary period; and finally suspension and termination. Underwood admitted that these incremental steps were not followed with respect to Barros but that in certain instances, such as this, he felt it was appropriate to proceed from oral warnings to termination. Furthermore, the employee manual mandates that when disciplinary action stronger than a warning is undertaken, the employee must be provided with written notice prior to enforcement that includes an announcement that an appeal of the action may be submitted in writing to the Director within five days. Underwood admitted that this policy was not followed with respect to Barros' termination.

Underwood further testified that after Barros had filed her claim, CBH created a report entitled "Documentation of Insubordination" consisting of notes compiled by himself and Hopkins. This report is the only documentation of Barros' alleged infractions. Neither Hopkins nor Underwood could produce the original notes and blamed that fact on a secretary, stating she destroyed them after she had typed the report. Furthermore, both Hopkins and Underwood admitted that they were not keeping notes of infractions with respect to other employees. Barros maintains that she was never given a

---

1. General Laws 1956 § 28–5–18 states that any complaint issued by the commission pursuant to this section must be so issued "within one year after the alleged unfair employment practices occurred." It appears in the instant case that the commission failed to comply with this mandatory procedure. *See Wayne Distributing Co. v. Rhode Island Commission for Human Rights,* 673 A.2d 457, 461–62 (R.I.1996). Nevertheless, neither party has raised this issue. Therefore, we shall deem it waived.

copy of the "Documentation of Insubordination" or copies of the notes upon which the report purportedly was based.

On June 29, 1994, the commission entered its decision, concluding that "the respondent discriminated against the complainant because of her pregnancy." The commission found that Barros had presented sufficient evidence to establish a prima facie case of discrimination. The commission also found that CBH had met its burden by articulating legitimate, nondiscriminatory reasons for its actions, namely bad attitude, habitual tardiness, failure to perform duties, complaints by Barros about CBH to clients, and failure to notify her supervisor rather than the Director about an anticipated absence. Nevertheless, the commission ultimately found that the reasons offered were merely a pretext for discriminatory employment practices. The commission stated that in its consideration of CBH's past method of dealing with Barros' prior conduct, along with its own policies, it was not credible that the difficulties arising out of notification for an anticipated absence would prompt CBH to terminate Barros.

Pursuant to G.L.1956 § 42–35–15, CBH appealed the commission's decision to the Superior Court. Oral arguments were heard on April 26, 1996. On May 16, 1996, the trial justice rendered a written decision wherein she upheld the commission's determination, holding that substantial evidence existed to support a finding of discrimination. Thereafter, CBH timely filed a petition for a writ of certiorari and a motion to stay enforcement of the Superior Court order. This Court issued the writ and stayed enforcement of the order.

In its petition for review CBH argues that the Superior Court erred in affirming the decision of the commission. Specifically, CBH asserts that the evidence presented was insufficient to support a finding that CBH intentionally discriminated against Barros on the basis of sex as well as a finding that the reasons given for her dismissal were merely pretextual. We disagree.

## II

## Standard of Review

In reviewing an administrative agency's decision, the Superior Court is limited to an examination of the certified record to determine whether the agency's decision is supported by substantial evidence. Section 42–35–15(g). *See also Wayne Distributing Co. v. Rhode Island Commission for Human Rights,* 673 A.2d 457, 459 (R.I.1996); *Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights,* 484 A.2d 893, 896 (R.I.1984). "Substantial evidence has been defined as 'such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance.'" *Newport Shipyard, Inc.* 484 A.2d at 897. The Superior Court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Section 42–35–15(g); *see also Wayne Distributing Co.,* 673 A.2d at 459; *Newport Shipyard, Inc.* 484 A.2d at 896–97. The Supreme Court, in reviewing the decision of the Superior Court in accordance with § 45–35–16, is engaged in a continuation of administrative proceedings and is limited to a review of the record as a whole to determine whether competent evidence exists to support the decision or the lower court committed any errors of law. Section 45–35–16; *see also Rhode Island Public Telecommunications Authority v. Rhode Island State Labor Relations Board,* 650 A.2d 479, 484–85 (R.I.1994).

## III

## The State Fair Employment Practices Act

Chapter 5 of Title 28, the "State Fair Employment Practices Act," was enacted to protect the right of all individuals in the state to equal employment opportunities, regardless of race or color, religion, sex, sexual orientation, handicap, age, or country of ancestral origin. Section 28–5–3. To that end § 28–5–7, under which Barros filed her claim, states:

"It shall be an unlawful employment practice:

(1) For any employer:

(i) To refuse to hire any applicant for employment because of his or her race or color, religion, sex, handicap, age, sexual orientation, or country of ancestral origin, or

(ii) Because of such reasons, to discharge an employee or discriminate against him or her with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment."

Section 28–5–6(2) states that "[b]ecause of sex" or "on the basis of sex" includes, but are not limited to pregnancy, childbirth, and other related medical conditions. In construing these provisions, we have previously stated that this Court will look for guidance to decisions of the federal courts construing Title VII of the Civil Rights Act of 1964. *See Newport Shipyard, Inc.*, 484 A.2d at 897–98.

### A. Burden–Shifting Paradigm

■ In Title VII cases, "[t]he burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) * * * allocates burdens of production and orders the presentation of evidence so as 'progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.'" *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995). Under the *McDonnell* analysis the employee has the initial burden of establishing a prima facie case demonstrating that the employer has discriminated against him or her for a proscribed reason. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. The burden placed on the complainant at this stage is not especially onerous and requires that the employee demonstrate that (1) he or she belongs to a protected class, (2) he or she was qualified for the position, (3) despite the requisite qualifications, he or she was discharged from the position, and (4) the position remained open and was ultimately filled by someone with roughly equivalent qualifications to perform substantially the same work. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502,

506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407, 415–16 (1993); *see also Resare v. Raytheon Co.*, 981 F.2d 32, 42 (1st Cir.1992); *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir.1990).

■ Once a prima facie case of discrimination is established, a presumption that the employer unlawfully discriminated against the employee arises. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981). Next the burden of production, not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678; *Resare*, 981 F.2d at 42. If the employer offers such a justification, the presumption created by the employee's prima facie case disappears and the focus shifts back to the employee to demonstrate that the proffered reasons are a mere pretext for discrimination. *Resare*, 981 F.2d at 42.

■ "To satisfy this third prong, a plaintiff must do more than simply cast doubt upon the employer's justification." *Id.* The burden does not require, however, a complainant to "come forward with evidence of the 'smoking gun' variety." *Id.* An employee can establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217.

■ Despite this burden shifting, the employee has the ultimate burden of persuasion in these matters. *Id.* at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215. Nevertheless, in situations in which the elements of a sufficient prima facie case combine with the factfinder's belief that the basis for dismissing the employee was pretextual, particularly if "accompanied by a suspicion of mendacity," the factfinder is permitted "to infer the ultimate fact of intentional discrimination." *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d at 418; *Woodman*, 51 F.3d at 1092. After a careful review of the record and the

lower court's decision, we conclude that Barros made out such a case and that there was sufficient evidence to support the commission's finding of intentional discrimination.

### B. Barros' Prima Facie Case

■ The record before this Court clearly demonstrates that Barros established a prima facie case of discrimination. Barros was pregnant at the time of her discharge and was thereby a member of a protected class. *See* § 28-5-6. As the commission's decision noted, Barros was qualified for the position in that she had successfully completed a three-month probationary period, had become a permanent employee, and had received several positive performance evaluations. Barros was terminated from her employment just two months after announcing her pregnancy, was never given any information about the center's policy regarding maternity leave, and was repeatedly questioned about when she would return to work after the birth of her child. Furthermore, the position was subsequently filled by a part-time nurse at the clinic who possessed the same or similar qualifications. Indeed, CBH does not dispute that Barros established a prima facie case of discrimination. As a result the burden of production shifted and it became incumbent upon CBH to rebut the claims of discrimination.

### C. CBH's Rebuttal

■ The center maintains that the evidence it presented was sufficient to sustain its burden of production and rebut Barros' prima facie case. We do not quarrel with this assertion. The record is clear and the commission concluded that CBH had rebutted the presumption of impermissible sex discrimination with evidence relating to Barros' bad attitude, her habitual tardiness, her failure in performance of duties, her complaints to clients about CBH, and her failure to notify her supervisor rather than the director about an anticipated absence. The analysis, however, does not end here. Rather the production of this evidence served only to remove the presumption of discrimination that Barros had established and to swing the "proof pendulum" back to her to "come for-

ward with enough evidence to expose [CBH's] articulated justification as a pretext, or cover-up, for sex discrimination." *Resare,* 981 F.2d at 43.

### D. Barros' Showing of Pretext

■ The record reflects that Barros presented evidence demonstrating that almost all the conduct that served as a basis for her termination took place prior to February 1991, when she announced her pregnancy. These prior incidents were addressed by way of oral warnings and meetings with her supervisors to work out any difficulties. Furthermore, Hopkins testified that in her opinion, Barros' behavior was improving. Regarding the alleged misconduct that occurred after February of 1991, including complaining about her employer to a client and failing to notify her immediate supervisor that she would be absent, Barros demonstrated that CBH failed to follow its established policies, as outlined in the employee manual, with respect to either discipline or termination. The commission noted that even if these incidents were viewed in their worst light and Barros was guilty of these infractions, CBH's past method of dealing with Barros' conduct made it incredible that these difficulties would cause CBH to terminate her.

Additional evidence supports the commission's conclusion that the method employed in terminating Barros further bolsters her claim of sex discrimination. The record clearly demonstrates that CBH failed to follow its own policies and procedures when it terminated Barros. The progressive disciplinary procedures previously implemented by CBH were discarded in favor of abrupt termination. Barros never received written notice, prior notice, or any notice of her internal appeal rights as outlined in the manual. Furthermore, even though Barros' bad attitude toward Hopkins was cited as a reason for dismissal, Hopkins was never consulted or informed of CBH's intention to terminate Barros, yet another procedure specified in the employment manual. Hopkins testified that she believed that oral warnings remained the appropriate method of discipline. On the basis of this evidence we con-

clude that the commission was not in error when it found that the reasons set forth by CBH in an attempt to justify the termination were in fact pretextual.

## IV

### Conclusion

For the foregoing reasons we deny the petition for certiorari and quash the writ heretofore issued. The judgment of the Superior Court is affirmed, and the papers in the case may be remanded to the Superior Court.

BOURCIER, J., did not participate.