Carmella Bucci                    :

v.                    :

Hurd Buick Pontiac GMC Truck, LLC et    :
al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Carmella Bucci    :

   v.     :

Hurd Buick Pontiac GMC Truck, LLC et :
    al.

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** Hurd Buick Pontiac GMC Truck, LLC, Hurd Buick Pontiac GMC Truck, LLC d/b/a Regine Pontiac GMC, and Hurd Chevrolet, Inc. (collectively Hurd or defendant), terminated the employment of Carmella Bucci, the plaintiff, when she was seventy-two years old. After it had hired the plaintiff twice at the age of sixty-seven for brief periods of employment, the defendant rehired Bucci, then aged sixty-eight, as a titles and registrations clerk. She then worked for a period of four years before Hurd terminated her for the final time. Bucci filed suit in Superior Court alleging, inter alia, that the defendant fired her due to unlawful age and disability discrimination in violation of G.L. 1956 § 28-5-1, the Fair Employment Practices Act (FEPA). A justice of the Superior Court granted summary judgment to Hurd, and Bucci timely appealed to this Court. We are called upon to determine if the parties have met their burdens under the now familiar McDonnell-Douglas framework so that we may

- 1 -

discern if summary judgment was appropriate. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The defendant hired Bucci on three different occasions, the first of which was as a part-time receptionist when Bucci was sixty-seven years old. That employment ended one month later because her services were no longer needed. In August 2001, Bucci was rehired, this time to work as the titles and registrations clerk. In this capacity, plaintiff was responsible for filing the necessary paperwork to transfer titles and registrations to the vehicles that defendant had purchased, sold, or leased. It was her task to resolve discrepancies, locate any missing documents, notarize titles, and send appropriate documentation to the various state registries of motor vehicles. At least once or twice per day, plaintiff interacted with customers in an effort to resolve issues pertaining to the registering of vehicles.

The defendant terminated Bucci's employment in November 2001, after it received complaints from customers through Hurd's finance and insurance and internet/e-mail departments. That, however, did not bring Bucci's employment history with Hurd to an end. In August 2002, at the suggestion of one of her former supervisors at a different dealership, Hurd hired Bucci for the third time to again serve as the titles and registrations clerk. At that time, Bucci was sixty-eight years old.

At the beginning of her third employment period, defendant provided Bucci with its employee handbook, which stated in relevant part that "our employment-at-will policy permit[s] you or HURD AUTOMOTIVE to end our relationship for any reason at any time." The handbook also says, "Neither the employee nor HURD AUTOMOTIVE is bound to continue the

employment relationship if either chooses, at its will, to end the relationship at any time." Notably, the handbook instructed employees "to refrain from any illegal, dishonest, or unethical conduct" and provided that failure to comply with Hurd's "standard of business ethics and conduct could lead to disciplinary action, up to and including possible termination of employment."

Finally, the handbook includes a "Progressive Discipline" section that outlines the manner in which the company will handle unsatisfactory conduct. However, and significantly, this section also cautions that Hurd may make use of that policy "at its discretion." The disciplinary process described may include any of four steps: "verbal warning, written warning, suspension with or without pay, or termination of employment." It provided that, although normally the steps would be followed in order, in some circumstances, including "extreme situations, termination of employment" may occur "without going through the usual progressive discipline steps." Bucci acknowledged receipt of the handbook in 2004.

When she returned to Hurd Automotive, Bucci's job responsibilities as the titles and registrations clerk were largely the same as before. She was required to complete and file the registrations and titles in a timely fashion for the vehicles that defendant sold, leased, or purchased. The record indicates that in 2005, defendant hired a new chief financial officer (CFO), a new office manager, and a new human resources director, all of whom either supervised or interacted with plaintiff. Unfortunately, some of the same performance issues that had bedeviled Bucci during her second stint of employment with Hurd began to surface. Although there had been one documented customer complaint about plaintiff's professionalism soon after she was rehired, indications of Bucci's unsatisfactory performance began to increase.

In an affidavit in support of Hurd's motion for summary judgment, office manager Alison Drake attested that Bucci was confrontational, lost paperwork, or provided incomplete paperwork to the various state motor vehicle departments and also that Drake had received complaints from employees in other departments about Bucci's "failure to fulfill her job duties in a timely manner." Another affiant, director of human resources, Connie Mandeville, attested that, on at least three occasions, she had received complaints from the Rhode Island Division of Motor Vehicles (DMV) about Bucci's failure to forward proper registrations in a timely manner. CFO Al Martin attested that he had personally observed plaintiff's poor attitude and that he was aware of customer complaints about delays in registration of vehicles that they had purchased or leased.

Also, Martin noticed that the titles and registrations department, over which he exercised oversight, was not as productive as similar departments in other dealerships at which he had been employed over the span of his forty-two-year career in the industry. He attested that, because that department did not generate activity reports outlining the current status of titles and registrations for vehicles sold by defendant, Hurd had difficulty tracking paperwork and responding to questions from customers or state registries. He also attested that, generally, the other titles and registrations departments at dealerships with which he had been associated performed additional duties, such as payroll processing. Martin discussed increasing productivity with Bucci, but he said that he found that she was generally unwilling to perform those responsibilities and that she resisted receiving training on the payroll computer system. By contrast, in Bucci's deposition testimony, she asserted that Martin had asked her to do billing for wholesale vehicles. This, she said, she was willing to do because she had performed that type of work previously. However, Bucci further testified that her computer was limited to use for

registrations, and, when it was programmed for the additional workload, a software conflict would crash the registrations program. Therefore, Bucci said, she required a second computer to perform the additional tasks, and she had not received it by the time of her termination. Nonetheless, Martin averred that Bucci failed to perform other tasks, such as generating activity reports, and that she had difficulty completing customers' registrations and timely filing them with the appropriate state registries.[1]

It is also significant that, in early 2006, plaintiff experienced certain physical health problems. She began having pain in her left knee to the extent that she required a walker and that made walking up and down stairs difficult for her. Eventually, defendant arranged to move Bucci's office from the second floor to the first so that she would be relieved of using the stairs. Bucci did not miss any time from work as a result of her knee pain. Also, in the summer of 2006, Bucci underwent cataract surgery, which required her to take medical leave for less than a week.

It is undisputed that, on the day before she underwent cataract surgery, Bucci forged two customer signatures to a letter sent to the Connecticut Department of Motor Vehicles (the department). After she had registered a vehicle for two customers who resided in Connecticut, plaintiff realized that the department had overcharged Hurd more than $900. Bucci learned from the department that the only way to have the overcharged amount refunded to defendant, rather than to the customers, was for the customers to send a letter to the department authorizing the change. Bucci testified at her deposition that, instead of waiting until after her surgery to resolve the issue, she drafted the letter, signed the customers' names, and faxed it to the department. Several days later, the customers called Hurd to complain that their signatures had been forged.

---

[1] Of particular note, plaintiff chose not to depose Martin.

The customers also contacted the police, although no criminal charges were lodged against Bucci. As a result of this incident, on September 6, 2006, plaintiff's supervisor, Wendy Bowen, and Mandeville disciplined plaintiff by means of a written warning, which she acknowledged by signing. The warning also instructed plaintiff that she was "never to sign for a customer under [any] circumstances." Mandeville testified that Martin and Bowen had considered discharging Bucci because of the forgery incident, but, on reflection, they had decided to give her another chance.

Approximately two months later, Martin terminated plaintiff's employment. Martin swore in his affidavit that, before the forgery incident, he had met with plaintiff on two occasions at which he communicated his expectations for her job performance. According to Martin, Bucci's performance failed to improve after those meetings; she continued to be delinquent in returning customer phone calls, was rude to coworkers, and filed late or incomplete title and registration paperwork. Martin attested that in November 2006, after the forgery incident, he reviewed Bucci's personnel file for the first time and discovered complaints filed against plaintiff dating from 2001. According to him, it was after this review that Martin discharged plaintiff. He maintained that he based his decision upon his personal observations of plaintiff's work performance, the forgery incident, his desire to obtain more productivity from the titles and registrations department, and plaintiff's unwillingness to perform these additional tasks. When she was deposed, Mandeville testified that Bucci had been fired for a variety of reasons, including the forgery and poor work performance before and after the forgery, coupled with the employer's desire to rearrange positions in an effort to increase productivity.

The plaintiff argues in her brief to this Court that Martin could not have reviewed Bucci's personnel file before he fired her because Mandeville testified when she was deposed that she

kept all personnel files locked away and Martin did not ask to review Bucci's file until after she had been dismissed. When plaintiff inquired why Martin asked to review Bucci's file after her dismissal, Mandeville responded that Martin had "wondered if anyone else had the trouble we had with her."

After she was fired, plaintiff filed for unemployment benefits with the Department of Labor and Training (DLT). In response to a letter from DLT that requested the reason defendant had discharged plaintiff, Hurd filed an employee termination report indicating that Bucci had been let go because the employer was "rearranging people's jobs." Mandeville, who signed the report, stated in her deposition testimony that Martin and Bowen decided to not disclose the negative reasons for plaintiff's discharge because defendant did not "want to make anything hard for [Bucci]" but that it was "too bad she had so many complaints." Mandeville testified that even though poor work performance is not a disqualifying event for the receipt of unemployment compensation benefits, she filed the report in that manner to ensure that Bucci could collect them.

The plaintiff filed charges of discrimination with the Rhode Island Commission for Human Rights (RICHR) on June 9, 2007.[2] After receiving a notice of right to sue from the RICHR on October 19, 2007, plaintiff filed a complaint in the Superior Court, alleging violations of FEPA, for discrimination based on age and disability. On February 4, 2011, after both sides had conducted discovery, Hurd filed a motion for summary judgment, alleging that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law.

After a hearing on April 12, 2011, the trial justice granted Hurd's motion for summary judgment in its entirety. Employing the burden-shifting, three-step analytical framework

---

[2] We thank the RICHR for the <u>amicus</u> <u>curiae</u> brief that it filed in this case.

outlined in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), the trial justice assumed that plaintiff had satisfied the first step of this paradigm, the <u>prima</u> <u>facie</u> case, found that defendant had met step two, the burden of producing a legitimate nondiscriminatory purpose for Bucci's termination, and then concluded that plaintiff had failed to meet her burden of presenting material evidence demonstrating that Hurd's legitimate reasons were merely a pretext for discrimination. Specifically, the trial justice found that plaintiff "provide[d] no substantive or evidentiary rebuttal" of Hurd's reasons for termination, including "poor work performance," "ongoing customer and co-worker complaints, as well as a need to realize more productivity from the title and registration clerk position formerly held by plaintiff." The plaintiff filed a timely appeal to this Court on April 27, 2011.

Before this Court, plaintiff presses arguments for her claims of both age and disability discrimination. In essence, she argues that (1) the trial justice erred in finding that defendant met its burden of producing a legitimate nondiscriminatory reason for plaintiff's dismissal; and (2) the trial justice erred in holding that plaintiff failed to demonstrate that those reasons were merely pretextual.

## II

### Standard of Review

"[T]his Court reviews a grant of summary judgment <u>de</u> <u>novo</u>." <u>Sullo v. Greenberg</u>, 68 A.3d 404, 406 (R.I. 2013) (quoting <u>Sacco v. Cranston School Department</u>, 53 A.3d 147, 149-50 (R.I. 2012)). "Examining the case from the vantage point of the trial justice who passed on the motion for summary judgment, '[w]e view the evidence in the light most favorable to the nonmoving party, and if we conclude that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law [,] we will affirm the judgment.'" <u>Id.</u> at

406-07 (quoting Sacco, 53 A.3d at 150). "Although summary judgment is recognized as an extreme remedy, * * * to avoid summary judgment the burden is on the nonmoving party to produce competent evidence that 'prove[s] the existence of a disputed issue of material fact [.]'" Id. at 407 (quoting Mutual Development Corp. v. Ward Fisher and Co., 47 A.3d 319, 323 (R.I. 2012)). We previously have cautioned that "we will not hesitate to affirm a grant of summary judgment if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case * * * .'" Beauregard v. Gouin, 66 A.3d 489, 493 (R.I. 2013) (quoting Lavoie v. North East Knitting, Inc., 918 A.2d 225, 228 (R.I. 2007)). Further, a factual dispute alone will not defeat a motion for summary judgment, "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### III

### Discussion

The Fair Employment Practices Act prohibits an employer from discharging an employee on the basis of age and disability. See § 28-5-7(1)(i). "This Court has adopted the federal legal framework to provide structure to our state employment discrimination statutes." Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006) (citing Newport Shipyard, Inc. v. Rhode Island Commission for Human Rights, 484 A.2d 893, 898 (R.I. 1984)). Because plaintiff claims employment discrimination, we will employ the now familiar three-part burden shifting framework as outlined by the United States Supreme Court in McDonnell-Douglas Corp., 411 U.S. at 802-04. See McGarry v. Pielech, 47 A.3d 271, 280 (R.I. 2012) (citing Center For Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998)).

## A

## Disability Discrimination

Before we address the merits of plaintiff's arguments on disability discrimination, we must first direct our attention to whether her appeal is ripe for our consideration. Although plaintiff states in her brief that she is appealing the trial justice's grant of summary judgment with respect to her claim of disability discrimination, she does not further develop this argument in her brief. We are, therefore, unable to consider it. Generally, we will consider an issue to be waived when a party "[s]imply stat[es] an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues * * * ." State v. Chase, 9 A.3d 1248, 1256 (R.I. 2010) (quoting Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n.1 (R.I. 2002)). Accord State v. Rolon, 45 A.3d 518, 519 n.1 (R.I. 2012) (finding arguments not advanced in full brief to Supreme Court to be waived). In its amicus curiae brief, the RICHR fashions a disability discrimination claim; however, we will not consider arguments that have been made by an amicus curiae but that were not advanced by a party. See Lane v. First National Bank of Boston, 871 F.2d 166, 175 (1st Cir. 1989) ("We know of no authority which allows an amicus to interject into a case issues which the litigants, whatever their reasons might be, have chosen to ignore."). Therefore, we confine our discussion to plaintiff's arguments with respect to her age-discrimination claim.

**Age Discrimination**

**1**

**<u>Prima</u> <u>Facie</u> Case**

In the first step of the <u>McDonnell-Douglas</u> paradigm, plaintiff must make out a <u>prima</u> <u>facie</u> case of age discrimination. <u>Neri</u>, 897 A.2d at 48-49. To meet this burden in cases of age discrimination, plaintiff must demonstrate that

> "(1) she was at least forty years of age; (2) her job performance met the employer's legitimate expectations; (3) the employer subjected her to an adverse employment action (<u>e.g.</u>, an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged." <u>Id.</u> at 49 (quoting <u>Ramírez Rodríguez</u> <u>v. Boehringer Ingelheim Pharmac[eu]ticals, Inc.</u>, 425 F.3d 67, 78 n.11 (1st Cir. 2005)).

If a plaintiff is able to establish these elements, a presumption arises that the employer engaged in unlawful discrimination. <u>Barros</u>, 710 A.2d at 685 (citing <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981)).

However, before we may consider the elements of a plaintiff's <u>prima</u> <u>facie</u> case, we pause to discuss whether plaintiff has properly brought this matter before the Court. In her brief to this Court, Bucci does not appear to present arguments to demonstrate that she had satisfied her burden to establish a <u>prima</u> <u>facie</u> claim. Instead, Bucci relies upon the trial justice's assumption that Bucci had made a successful <u>prima</u> <u>facie</u> claim without establishing it, and she directs us to the memorandum she filed objecting to defendant's motion for summary judgment, "[t]o the extent this Court decides to review [the <u>prima</u> <u>facie</u> claim] <u>de</u> <u>novo</u>[.]"[3] Article I, Rule 16(a) of

---

[3] Although not material to our discussion here, we do note that plaintiff did not include the objection to summary judgment in her appendix on appeal. Also, it goes without saying that our review of summary judgment is always <u>de</u> <u>novo</u>.

the Supreme Court Rules of Appellate Procedure states that "[e]rrors not claimed, questions not raised and points not made ordinarily will be treated as waived and not be considered by the Court." As discussed above, we generally will consider an issue waived that is not raised by the appellant. Chase, 9 A.3d at 1256.

It is also true, however, that the trial justice assumed, without deciding, an element of a claim in a summary judgment proceeding, which we have held is "consistent with the summary judgment standard of viewing all facts in the light most favorable to the non-moving party, here, [the] plaintiff." See Daniels v. Fluette, 64 A.3d 302, 305 (R.I. 2013). We consistently have agreed with the United States Supreme Court that a plaintiff's burden to establish a prima facie case of discrimination is "not especially onerous." See Barros, 710 A.2d at 685; see also St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993) (holding the plaintiff satisfies the burden of a prima facie case by a preponderance of the evidence); McGarry, 47 A.3d at 280. In Daniels, 64 A.3d at 305, the trial justice assumed an element, and we adopted that approach. Thus, we will give plaintiff the benefit of the doubt and assume without deciding that she has established a prima facie case, thereby satisfying the first step of McDonnell-Douglas.[4]

---

[4] Unlike in Center for Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998), defendant raises a challenge to plaintiff's ability to establish her prima facie case on appeal. The defendant argues that plaintiff failed to meet Hurd's legitimate expectations because of her poor work performance, forgery, and customer complaints. See also Neri v. Ross-Simons, Inc., 897 A.2d 42, 49 (R.I. 2006). But see Ashley v. Paramount Hotel Group, Inc., 451 F. Supp. 2d 319, 332 (D.R.I. 2006) (determining under FEPA that the plaintiff did not meet the employer's legitimate expectations because there was unrebutted evidence of the plaintiff's poor work performance). Several federal circuits have discussed the difficulty inherent in denying a plaintiff's prima facie claim on the basis of not meeting legitimate expectations because employers articulate the same legitimate nondiscriminatory reasons for termination used in step two, which essentially forces the plaintiff to argue pretext at the prima facie stage. See Thomas v. Denny's, Inc., 111 F.3d 1506, 1510 (10th Cir. 1997); Davenport v. Riverview Gardens School District, 30 F.3d 940, 944 (8th Cir. 1994); Siegel v. Alpha Wire Corp., 894 F.2d 50, 54 (3d Cir. 1990). We need not, and do not, reach the issue here because doing so is not necessary for us to decide this case.

**2**

**Legitimate Nondiscriminatory Reason**

Under the McDonnell-Douglas framework, after plaintiff establishes her prima facie case, the burden shifts to defendant to come forward with legitimate nondiscriminatory reasons for the employee's termination. Neri, 897 A.2d at 49 (citing Barros, 710 A.2d at 685). The defendant's burden is one of production, not persuasion. Id. (citing Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 (R.I. 2004)). When a defendant offers such a reason, it "eliminates the presumption of discrimination created by the prima facie case." Id. (citing Wellborn v. Spurwink/Rhode Island, 873 A.2d 884, 889 (R.I. 2005)). To satisfy this burden of production, a defendant need only offer affidavits supporting the nondiscriminatory reason. Id. at 50.

The defendant articulated legitimate nondiscriminatory reasons for discharging plaintiff as follows: (1) plaintiff forged customers' signatures on a letter submitted to a state agency; (2) plaintiff was unable or unwilling to perform additional responsibilities such as generating activity reports and payroll processing through defendant's computer system; (3) plaintiff struggled to properly and timely complete customers' registrations with appropriate state departments of motor vehicles; (4) defendant received complaints from customers and coworkers about plaintiff's poor work performance; (5) following the forgery incident, plaintiff's work performance did not improve, and she failed to take on additional responsibilities that Martin had requested of her. To support its assertions, defendant presented plaintiff's admission to the forgery in her deposition testimony, Mandeville's deposition testimony, documented customer complaints, and affidavits from Martin, who fired Bucci, as well as Hurd's office manager, Alison Drake, who attested to Bucci's poor work performance and complaints that she received about Bucci from other Hurd employees.

On appeal, plaintiff sets forth a number of arguments attempting, without success in our opinion, to demonstrate that the trial justice erred when she found defendant failed to meet its burden of production.

First, plaintiff contends that defendant is precluded from relying on a reason that was not available to it at the time of the discharge, or that it did not consider at the time the termination was effectuated. In Martin's 2011 affidavit, he swore that he made the decision to terminate Bucci after he had learned about complaints about her dating back to 2001 and that those complaints had been recorded in Bucci's personnel file. However, Bucci points out that that assertion stands in stark contrast to Mandeville's deposition testimony, in which Mandeville testified that no one had examined Bucci's personnel file until after Martin had discharged her. This, she argues, is mendacious and demonstrates clearly that Hurd's stated reasons for firing Bucci were merely pretextual. However, we are not persuaded because, even if Martin had not viewed Bucci's personnel file at any time before he discharged her, Bucci does not dispute the other incidents that are set forth in Martin's affidavits.[5] In those affidavits, Martin said that he had received complaints from coworkers about plaintiff's poor work performance and attitude and from customers who had complained about plaintiff. Martin further attested that he met with Bucci on at least two occasions with regard to his expectations of her, but that the meetings failed to result in any significant improvement in her performance because she continued to not return customers' telephone calls, filed late or incomplete registrations, and declined to be trained on the payroll computer system to assist with payroll processing.

---

[5] Martin filed two affidavits, the first in 2007, and the second in 2011. The 2007 affidavit makes no mention of a review of Bucci's personnel file at any point, but it does refer to ongoing customer complaints about Bucci, her poor attitude, and her poor performance.

Second, Bucci cites to our decision in Casey, 861 A.2d at 1037 n.2, in which we held that any legitimate nondiscriminatory reason must be admissible under the rules of evidence. See also Burdine, 450 U.S. at 255 and n.9. Bucci argues that to depend on customer complaints from 2001-02 is to rely upon hearsay upon hearsay because the complaints upon which defendant relied were vague and were from unidentified customers. We do not agree. The record indicates that defendant documented four complaints made against Bucci in 2001-02, three of which state the name of the complainant and specify the reason for the complaint. Moreover, even if we were to agree with Bucci that these complaints were rife with hearsay, Bucci nonetheless fails to dispute the affidavits and testimony of Hurd employees that they had received complaints from customers, motor vehicle departments, and coworkers in 2006, which appear to provide a more legitimate reason for termination than complaints from five years earlier.[6]

Finally, plaintiff maintains that defendant relied upon evidence that was too vague. Bucci urges that Mandeville could not provide the name of one complainant, or even describe in detail the nature of the complaints. In our opinion, this is not dispositive because Martin, Drake, and Bowen all swore to customer, coworker, and motor vehicle department complaints arising from Bucci's job performance. Bucci has not challenged these averments on appeal.

Because defendant's burden is limited to one of production, we are convinced that Hurd has provided legitimate nondiscriminatory reasons for discharging plaintiff.

---

[6] In all likelihood, the complaints from 2001-02 would not constitute hearsay because, as we also discussed in Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 n.2 (R.I. 2004), when considering similar complaints, defendant does not offer the complaints for the truth of the matter asserted, but to serve as the basis for Martin's state of mind when he decided to terminate plaintiff. See Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1193 (R.I. 1994).

**3**

**Pretext**

The final step articulated in <u>McDonnell-Douglas Corp.</u> shifts the burden back to the plaintiff to focus on "the ultimate question of 'discrimination <u>vel non</u>.'" <u>Neri</u>, 897 A.2d at 50 (quoting <u>Casey</u>, 861 A.2d at 1037). To prove discrimination, a plaintiff need not provide a "smoking gun," but rather must prove that "[the] defendants' legitimate, nondiscriminatory reason for not hiring [her] was merely pretext (which would mean that the real reason for not hiring [the] plaintiff was unlawful animus)." <u>Casey</u>, 861 A.2d at 1038 (citing <u>Barros</u>, 710 A.2d at 685). The plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Barros</u>, 710 A.2d at 685 (quoting <u>Burdine</u>, 450 U.S. at 256). Further, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." <u>Casey</u>, 861 A.2d at 1038 (quoting <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000)). The inference of discrimination is stronger if there is a "suspicion of mendacity" surrounding the reason for terminating the employee. <u>Neri</u>, 897 A.2d at 50 (quoting <u>Barros</u>, 710 A.2d at 685). However, the plaintiff has the burden of demonstrating not only that the offered reasons are false, but "that discrimination was the real reason." <u>McGarry</u>, 47 A.3d at 281.

On appeal, plaintiff contends that the trial justice erred when she found that plaintiff had failed in her burden to demonstrate pretext. In that regard, the trial justice found that plaintiff had "fail[ed] to offer any valid rebuttal to the defendant's alleged legitimate reason for her termination." The plaintiff, in her efforts to convince us to vacate the judgment, unleashes a

barrage of arguments to demonstrate the trial justice's error. Because plaintiff offers no direct evidence of a discriminatory reason, she employs the indirect method to undermine defendant's proffered reasons for discharge.

Primarily, Bucci argues that the trial justice erred because there was evidence of falsehood or mendacity. Specifically, Bucci contends that the affidavit of Martin, in which he swore that he fired Bucci after gleaning customer complaints from her personnel file, is an "undisputed lie" because Mandeville, the director of human resources, testified in her deposition that Martin did not even review the file until after Bucci was fired. Also, Bucci claims that Mandeville's testimony that the DMV had made complaints about Bucci's job performance was "unworthy of belief" because a DMV employee who had interacted with Bucci attested that he had no recollection of making complaints about Bucci or having any problems with her job performance. As further evidence of pretext, Bucci contends that defendant deviated from its own personnel policies when it fired her. Bucci points out that, aside from the warning notice she received for the forgery incident, she received no other documented incident reports or warning notices, either prior to or after the forgery incident.

In this step of a McDonnell-Douglas analysis, we first must consider whether the purportedly legitimate, nondiscriminatory reasons for termination offered by the employer are tainted by this claimed "suspicion of mendacity." Neri, 897 A.2d at 50 (quoting Barros, 710 A.2d at 685). In Barros, 710 A.2d at 686, we observed that the employer found the employee's conduct to be objectionable only after she had announced that she was pregnant. That gave rise to a suspicion of mendacity, which, when combined with the employer's failure to follow its personnel policies, was deemed to be sufficient to support a finding of unlawful gender discrimination. Id. We have noted that "Barros stands for the proposition that evidence

- 17 -

suggesting a meaningful 'suspicion of mendacity' will greatly bolster a plaintiff's case." Neri, 897 A.2d at 50. However, and without in any way retreating from our holding in Barros, we also echo the cautions described in Mesnick v. General Electric Co., 950 F.2d 816, 825 (1st Cir. 1991), that "[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." Simply put, an employer may terminate an employee for any reason, good or bad, provided that "the decision to fire does not stem from the person's age." Freeman v. Package Machinery Co., 865 F.2d 1331, 1341 (1st Cir. 1988).

We simply do not perceive a Barros-like event in the present case. Indeed, it would appear that the event that ultimately would serve as the harbinger for plaintiff's ultimate discharge was Hurd's hiring of Martin as CFO in 2005. Martin seemingly had a higher, more stringent standard with which he wanted plaintiff to comply. It is true that there is some inconsistency between the testimony of Mandeville and the affidavit of Martin about the timing of Martin's review of plaintiff's personnel file. However, a mere inconsistency, without more, does not give rise to a suspicion of mendacity. Bucci is correct when she argues that the facts should be construed in a light most favorable to her, but we do not agree that this standard demands that we consider the factual dispute as evidence of intentional falsehood. In a de novo review of a grant of summary judgment, we will make all reasonable inferences in favor of the nonmoving party. Martin v. Marciano, 871 A.2d 911, 914-15 (R.I. 2005). Because the record contains only the inconsistency between Martin's affidavit and Mandeville's deposition testimony and not some other evidence that would suggest that Martin had been untruthful in his affidavit, it would be inappropriate for this Court to conclude that Martin lied. Viewing the facts in the light most favorable to Bucci, it is certainly reasonable to conclude that Martin never

- 18 -

reviewed plaintiff's personnel file before he discharged her. However, were we to agree with plaintiff that a party could defeat summary judgment whenever there is some non-material factual dispute, summary judgment would never be appropriate in these cases because the trial court would be required to assume that the moving party had lied, even though there may be other reasonable explanations for the discrepancy.[7]

Moreover, even assuming that Martin had not reviewed the personnel file before he fired Bucci, the 2001-02 complaints about Bucci's performance were not the solitary evidence defendant presented to support the termination. Mandeville testified in her deposition that the forgery incident was one of the reasons for firing Bucci. It is also significant that Martin supervised plaintiff's department for more than a year, received complaints from coworkers about Bucci's performance, and personally attested to her unwillingness to assume more responsibilities in her capacity as titles and registrations clerk.

The plaintiff also provided the affidavit of DMV employee Thomas San Bento to support her pretext argument; she argues that that affidavit demonstrates that Mandeville's testimony regarding DMV complaints about Bucci is not worthy of belief. It is important to note, however, that San Bento said in his affidavit that he did not recall making any complaints about Bucci and that he found her to be "professional, efficient and competent." But Mandeville never said that it

---

[7] Bucci also contended in her brief, and at oral argument, that the apparent inconsistency between Martin's affidavit and Mandeville's deposition testimony was a material factual dispute that should have been resolved by a jury. We disagree. "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." Calero-Cerezo v. United States Department of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986)). This dispute does not have the potential to affect the outcome of the case because plaintiff does not challenge the several other offered reasons for her termination, which were sufficient to overcome a claim of discriminatory animus. Indeed, in her brief submitted to this Court, plaintiff acknowledges that Martin based his decision to fire Bucci on what he found in the file and on his own "observations and assessments of her work performance."

had been San Bento who had made a complaint to her about Bucci. Indeed, other employees from the DMV, or employees from motor-vehicle departments from other states, may well have complained about Bucci's performance. When a plaintiff attempts to counter a claim by an employer that it fired an employee for poor performance, it is simply not sufficient for a plaintiff to present evidence that her performance was satisfactory. See Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). The plaintiff's burden is to demonstrate that it was unlawful discrimination that motivated the dismissal, and not simply an employer's erroneous belief or assessment about poor performance. Id. at 1267.

The plaintiff correctly asserts that Hurd did not follow its own employment-termination policies that are set forth in its employee handbook, and she relies upon Barros, 710 A.2d at 686, to support an argument that this too gives rise to a suspicion of mendacity. This argument is unpersuasive, however, because it is undisputed that her employment was designated as "at will" that could be terminated "with or without cause, at any time." Hurd's policy of progressive discipline does outline a system of escalating actions to address an employment deficiency, but it also reiterates, at the outset of the description of the policy, that employment is "at will" and that defendant "may use progressive discipline at its discretion." On the other hand, the handbook in Barros, 710 A.2d at 686, did not grant discretion to the employer when pursuing employment termination. Even if defendant had the benefit of a larger paper trail detailing plaintiff's alleged performance deficiencies and if, as a result, defendant had made use of the progressive-discipline policy, its failure to do so does not constitute pretext when implementation of the policy is discretionary and plaintiff is an at-will employee. Cf. Morris v. City of Chillicothe, 512 F.3d 1013, 1020 (8th Cir. 2008) (holding failure to follow progressive discipline policy does not constitute pretext when employer reserves right to fire at-will employees without notice);

Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1120 (10th Cir. 2007) (holding failure to follow progressive discipline does not demonstrate pretext when use of the policy is entirely discretionary); Fane v. Locke Reynolds, LLP, 480 F.3d 534, 541 (7th Cir. 2007) (holding no pretext for not following progressive discipline where policy contemplated immediate termination for certain offenses).

Further, the policy states that there are some employee problems that would in "extreme situations" warrant immediate termination. Presumably, one such extreme situation could stem from an employee's failure, by engaging in a forgery, to comply with Hurd's standard of business ethics charging its employees to refrain from any dishonest or unethical conduct. Hurd's handbook continues that violation of this standard "could lead to disciplinary action, up to and including possible termination of employment." It is clear that plaintiff received a warning after the forgery, but defendant argues that the forgery was but a part of the mosaic leading to her termination; it was not the sole grounds for dismissal. Nevertheless, such an incident could surely be taken into consideration at the time the final decision about Bucci's employment was made. However, it is important to consider that determining whether the employer properly or efficiently made use of its discretionary progressive-discipline policies is not the role for this Court. Rather, our role is to determine if the personnel action was motivated by discrimination due to age. To second-guess discretionary uses of personnel policies for at-will employees when there is a lack of evidence of age discrimination would place this Court in the role of a "super personnel department"; a role we decline to embrace.

The plaintiff next argues that there is an inconsistency between Martin's affidavit, in which he swore that Bucci was unwilling to take on certain additional tasks, and Bucci's deposition testimony, in which she indicated that she was willing, but computer problems

stymied her ability to do so. On appeal, Bucci claims that, after she informed Martin that she required two computers to begin the payroll processing, Martin promised to provide her with a second computer but then failed to abide by his commitment. However, when we analyze Bucci's deposition testimony, it is unclear that she actually informed Martin of the need for two computers, and there is no indication that Martin promised or even indicated to Bucci that he would provide her with a second computer. Even if we were to assume that Bucci's version of events is accurate, she fails to address defendant's affidavits that stated she was unwilling to receive training on Hurd's payroll system and that she did not take on the other tasks that Martin requested of her, such as generating activity reports to track the status of pending registrations. [8]

---

[8] Bucci's testimony on both of these matter is as follows:

> "Q: Do you recall sitting down with Mr. Martin and him talking to you about some changes he wanted to make with respect to the way you had been doing things?
>
> "* * *
>
> "[BUCCI]: In my office I had a computer that was just for the Registry, nothing else. So, he had said that he wanted that office to do more than just registrations. He wanted it to do the billing for the wholesale vehicles. I said to him fine. I've done that before, so I can do it again.
>
> "So, he was going to make arrangements to have the information put into my computer, which was supposed to be only for registrations. So, he had someone come in to program the whole computer for what he wanted done for the dealership.
>
> "It didn't work out, because every time I went from the Registry format to the Hurd format, it would kick me out of registrations. So, I ended up calling the Registry every time I got kicked out, and I was told by Mr. Sambento [sic] that that computer should not be used for anything else but registrations.
>
> "* * * If he wanted me to do something else, he was going to have to get me a new computer just for that so I would have two computers.
>
> "They were going to be in the process of doing it and all they gave me at the time was the printer for the billing but never set up the computer for it. It was still that way until I left."

Finally, in an effort to demonstrate pretext, Bucci takes aim at the forms defendant provided to DLT after her discharge, which were silent as to any negative reasons for plaintiff's termination. She points out that Mandeville, who filled out and filed the report, specified that "we are rearranging people's jobs" as the reason for termination. The plaintiff contends that this inconsistency demonstrates that the real reason for her firing was her age. This argument also founders because the record reveals that Hurd's consistent effort to achieve more productivity out of plaintiff's department was a reason for her termination. Further, Mandeville testified that Hurd often did not list negative reasons for termination out of a concern that doing so might jeopardize the former employee's ability to collect unemployment. Specifically, Mandeville testified that she did not "want to make anything hard" for Bucci. Cf. Hux v. City of Newport News, Va., 451 F.3d 311, 315 (4th Cir. 2006) ("Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.").

Ultimately, after considering the pleadings and affidavits in a light most favorable to the plaintiff, it is our opinion that the plaintiff has been unable to cast any meaningful doubt that the defendant's proffered reasons for termination were merely a cover-up for age discrimination. Arguably, Hurd did not handle this termination as nimbly as possible, but it is the plaintiff's burden to demonstrate that the true reason for discharge was unlawful discrimination, and she has not done so. Further, we are not persuaded that there are any genuine issues of material fact that would need to be decided by a jury. A reasonable juror could not infer age discrimination based on the presence of minor inconsistencies in testimony and the undisputed evidence of substandard performance. We have carefully considered each of the other arguments raised by

the plaintiff, and we conclude that they are without merit. We hold that the motion justice properly entered summary judgment in favor of the defendant on both employment discrimination claims.

## IV

## Conclusion

For the foregoing reasons, we affirm the grant of summary judgment in favor of the defendant. The record shall be remanded to the Superior Court.

**Justice Goldberg, concurring in part and dissenting in part.** This case highlights the tension between the summary judgment standard and the substantive framework applied to employment discrimination claims. Although this Court has adopted the three-step McDonnell-Douglas framework in these cases, we did not dispense with the Rules of Civil Procedure. Rule 56 of the Superior Court Rules of Civil Procedure requires that a Superior Court justice deny summary judgment when there exists a genuine issue of material fact. Because my de novo review of the record results in a substantially different view of the evidence and because I therefore conclude that genuine issues of material fact concerning Hurd's motivation for terminating Bucci are manifest, I respectfully dissent.[1]

---

[1] I concur with the majority's conclusion that plaintiff's disability discrimination claim was waived. Although many of the facts supporting an age discrimination claim would also support a disability discrimination claim, plaintiff's discussion of her medical conditions in her brief states only that "[d]uring CFO Martin's tenure, Plaintiff began having problems associated with old age." No such discussion of a disability occurs in the brief. The only mention of any disability whatsoever is Bucci's averment that she filed a disability claim with the Commission for Human Rights and the allegations in the complaint. With those meager statements, particularly given that there is a question of whether there is any evidence that defendant regarded her as having a disability, the issue was not sufficiently developed for our review.

# I

## Summary Judgment in Employment Discrimination Cases

An employment discrimination case is a unique cause of action. Unlike a straightforward tort or breach of contract case—where, on summary judgment, a trial justice can look at one set of elements to a cause of action and determine whether or not there is a genuine issue of material fact relating to one or more of those elements—the McDonnell-Douglas framework is more akin to a moving target with three steps and shifting burdens of proof and production. Thus, I begin my analysis by describing the proper legal context for consideration of a motion for summary judgment in an employment discrimination case.

## A

### The Summary Judgment Standard

The starting point for any legal analysis by this Court is the standard of review. "[T]his Court reviews a grant of summary judgment de novo." Sullo v. Greenberg, 68 A.3d 404, 406 (R.I. 2013) (quoting Sacco v. Cranston School Department, 53 A.3d 147, 149-50 (R.I. 2012)). Thus, we examine the case "from the vantage point of the trial justice who passed on the motion for summary judgment * * *." Id. Critically important here, "[w]e view the evidence in the light most favorable to the nonmoving party * * *." Id. In performing this review, we draw all reasonable inferences in favor of the nonmoving party. See Peloquin v. Haven Health Center of Greenville, LLC, 61 A.3d 419, 424-25 (R.I. 2013) (noting that "the facts and all reasonable inferences therefrom" are viewed "in the light most favorable to the nonmoving party" (quoting Derderian v. Essex Insurance Co., 44 A.3d 122, 126-27 (R.I. 2012))).

"Ultimately, the 'purpose of the summary judgment procedure is issue finding, not issue determination.'" DeMaio v. Ciccone, 59 A.3d 125, 130 (R.I. 2013) (quoting Estate of Giuliano

- 25 -

v. Giuliano, 949 A.2d 386, 391 (R.I. 2008)).  After examining the evidence in the light most favorable to the nonmoving party and drawing reasonable inferences, summary judgment is appropriate only when "there is <u>no genuine issue as to any material fact</u> and * * * the moving party is entitled to judgment as [a] matter of law."  Sola v. Leighton, 45 A.3d 502, 506 (R.I. 2012) (quoting Plunkett v. State, 869 A.2d 1185, 1187 (R.I. 2005) (emphasis added)).  If the evidence submitted permits an inference that creates a genuine issue of material fact, the motion must be denied.  See DeMaio, 59 A.3d at 132 (holding that a Superior Court justice may not choose between conflicting inferences at summary judgment stage).  Finally, "[s]ummary judgment is a drastic remedy, and a motion for summary judgment should be dealt with cautiously."  Cruz v. DaimlerChrysler Motors Corp., 66 A.3d 446, 451 (R.I. 2013) (quoting DeMaio, 59 A.3d at 129).

**B**

**Employment Discrimination and the <u>McDonnell-Douglas</u> Framework**

The plaintiff here asserts a statutory right; thus, the analysis should begin with the statute that grants her the right that she seeks to enforce.  The Rhode Island General Laws provide that it is unlawful for any employer "to discharge an employee * * * because of his or her * * * age * * *."  G.L. 1956 § 28-5-7(1)(i)(ii).  In enacting the Fair Employment Practices Act (FEPA), the General Assembly made the following legislative findings:

> "The practice or policy of discrimination against individuals because of their race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin is a matter of state concern.  Such discrimination foments domestic strife and unrest, threatens the rights and privileges of the inhabitants of the state, and undermines the foundations of a free democratic state.  The denial of equal employment opportunities because of such discrimination and the consequent failure to utilize the productive capacities of individuals to their fullest extent deprive large segments of the

- 26 -

population of the state of earnings necessary to maintain decent standards of living, necessitates their resort to public relief, and intensifies group conflicts, thereby resulting in grave injury to the public safety, health, and welfare." Section 28-5-2.

Further, the Legislature declared that it is "the public policy of this state to foster the employment of all individuals in this state in accordance with their fullest capacities, regardless of their * * * age * * * and to safeguard their right to obtain and hold employment without such discrimination." Section 28-5-3.

To analyze employment discrimination cases under FEPA, this Court has looked to analogous federal anti-discrimination law. See Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006) ("This Court has adopted the federal legal framework to provide structure to our state employment discrimination statutes."). Thus, "the parties must engage in the three-part burden-shifting paradigm set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)." McGarry v. Pielech, 47 A.3d 271, 280 (R.I. 2012).

Under the first McDonnell-Douglas prong, the plaintiff must set forth a prima facie case of discrimination. McGarry, 47 A.3d at 280. Thus, in an age discrimination case based upon termination, the plaintiff must show that

> "(1) she was at least forty years of age; (2) her job performance met the employer's legitimate expectations; (3) the employer subjected her to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged." Neri, 897 A.2d at 49 (quoting Ramirez Rodrigues v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 78 n.11 (1st Cir. 2005)).

"The burden placed on the complainant at this stage is not especially onerous." Center for Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680, 685 (R.I. 1998). "Once the plaintiff establishes these four elements, a presumption arises that the defendant committed unlawful discrimination." McGarry, 47 A.3d at 280.

Once the plaintiff has met his or her initial burden, the burden shifts to the defendant to "offer a legitimate, nondiscriminatory reason for terminating the employee." Neri, 897 A.2d at 49. The burden on the defendant employer is one "of production rather than persuasion." Id. If the defendant proffers such a nondiscriminatory explanation, the presumption of discrimination disappears. McGarry, 47 A.3d at 280.

The third prong in the McDonnell-Douglas framework "constitutes the crux of proving a discrimination case." McGarry, 47 A.3d at 281. This prong "focuses on the ultimate question of 'discrimination vel non.'" Neri, 897 A.2d at 50 (quoting Casey v. Town of Portsmouth, 861 A.2d 1032, 1037 (R.I. 2004)). Generally, at this stage, the plaintiff must show that the employer's proffered reasons for its action were pretextual and that discrimination was the real reason for the termination. McGarry, 47 A.3d at 281. Because the standard for this prong on summary judgment is at the heart of this case, it is discussed in more detail below.

## C

**The Problem of Summary Judgment in Employment Discrimination Cases**

As with most employment discrimination cases, this case glides through the first and second prongs of the McDonnell-Douglas framework with ease. Accordingly, I agree with the majority's analysis under those prongs. However, on consideration of the third prong, our views diverge.

The third prong of the McDonnell-Douglas framework is intrinsically malleable. This Court's pronouncements in previous cases provide fertile ground for both employers and employees. A defendant-employer can point to the fact that "a plaintiff must do more than simply cast doubt upon the employer's justification [for firing the plaintiff]." McGarry, 47 A.3d at 281 (quoting Resare v. Raytheon Co., 981 F.2d 32, 42 (1st Cir. 1992)). Furthermore, "[t]he

plaintiff must demonstrate not only that the defendant's purported reason for not hiring the plaintiff was false, but also that discrimination was the real reason." Id. Nevertheless, a plaintiff-employee knows that "[p]roof of discrimination does not require evidence of the 'smoking-gun' variety," and that the factfinder may "infer the ultimate fact of intentional discrimination." Casey, 861 A.2d at 1038 (quoting Barros, 710 A.2d at 685). The thin line between sufficient and insufficient evidence really comes to light when juxtaposing the statements that "proof that a reason for not hiring plaintiff was pretextual is insufficient, on its own, to support a finding of discrimination," McGarry, 47 A.2d at 281 (quoting Casey, 861 A.2d at 1038), yet, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Neri, 897 A.2d at 50 (quoting Casey, 861 A.2d at 1038) (emphasis added).

Applying these precepts is particularly problematic at the summary judgment stage. See Hon. Bernice B. Donald and J. Eric Pardue, Bringing Back Reasonable Inferences: A Short, Simple Suggestion for Addressing Some Problems at the Intersection of Employment Discrimination and Summary Judgment, 57 N.Y.L. Sch. L. Rev. 749, 755 (2013) ("The application of the McDonnell Douglas framework is complicated by the procedural rules of summary judgment."). Although typically framed as a question of what the plaintiff must "prove," a plaintiff is not required to "prove" anything on a motion for summary judgment in the same way that he or she would at trial. On summary judgment, the plaintiff must only put forth enough evidence to show that a dispute of material fact exists in the case.

Recent legal literature discusses the mountain that a plaintiff-employee must climb just to get to a jury trial. See Kerri Lynn Stone, Shortcuts in Employment Discrimination Law, 56 St.

Louis U. L.J. 111, 112 (2011) ("Research confirms everyday observations of how much more difficult it is for employment discrimination plaintiffs than for other plaintiffs to survive pre-trial motions to dismiss their cases and to win at trial or on appeal."). "The Federal Judicial Center has noted that '[s]ummary judgment motions by defendants are more common in [employment discrimination] cases, are more likely to be granted, and more likely to terminate the litigation.'" Donald and Pardue, 57 N.Y.L. Sch. L. Rev. at 752 (quoting Memorandum from Joe Cecil & George Cort, Federal Judicial Center, to Judge Michael Baylson, at 3 (Aug. 13, 2008)). "Recent data suggests that * * * 73% of summary judgment motions in employment discrimination cases are granted—the highest of any type of federal civil case." Elizabeth M. Schneider, The Changing Shape of Federal Civil Pretrial Practice: The Disparate Impact on Civil Rights and Employment Discrimination Cases, 158 U. Pa. L. Rev. 517, 549 (2010). Although these studies concern federal courts—and to my knowledge no such study of Rhode Island cases exists—my experience with employment discrimination cases comports with these conclusions.

Here, the majority parses each piece of evidence proffered by plaintiff and—while purporting to view the evidence in the light most favorable to plaintiff—proceeds to explain (and indeed decide) why each of plaintiff's arguments fail to show pretext or discrimination. It is my opinion that this is the wrong approach; it results in a piece-by-piece analysis of the evidence rather than placing the evidence in the context of the whole claim. See Schneider, 158 U. Pa. L. Rev. at 544 ("Judicial opinions on summary judgment are often so mechanistic that they become 'sliced and diced,' a process that * * * 'sees less in the parts by subjecting the nonmovant's "evidence" to piece-by-piece analysis' instead of analyzing it contextually." (quoting Stephen B. Burbank, Vanishing Trials and Summary Judgment in Federal Civil Cases: Drifting Toward Bethlehem or Gomorrah?, 1 J. Empirical Legal Stud. 591, 624, 625 (2004))).

In my opinion, the correct approach requires a court to look at the case as a whole and consider the ultimate issue based on the totality of the evidence. Although the details are malleable, it is settled that the third prong "focuses on the ultimate question of 'discrimination vel non.'" Neri, 897 A.2d at 50 (quoting Casey, 861 A.2d at 1037); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 153 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."). A Second Circuit judge with extensive employment discrimination experience frames the ultimate issue on summary judgment as "whether the plaintiff presented evidence from which a reasonable jury could find that, more likely than not, the employer's decision was motivated at least in part by discrimination." Hon. Denny Chin, Summary Judgment in Employment Discrimination Cases: A Judge's Perspective, 57 N.Y.L. Sch. L. Rev. 671, 679 (2013) (emphases added). Importantly, however, Judge Chin notes that "[t]he evidence has to be considered as a whole—seemingly innocuous or innocent pieces of evidence may take on a different meaning when placed in context." Id. at 680.

The preferred approach of placing the evidence in context and considering the ultimate issue is a route that is grounded by Supreme Court precedent. Although undertaking review of a Rule 50 motion in an employment discrimination case, the Supreme Court noted that "[i]n the analogous context of summary judgment under Rule 56, we have stated that the court must review the record 'taken as a whole.'" Reeves, 530 U.S. at 150 (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). Furthermore, in reviewing the evidence, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 150 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Significantly, when the case is viewed in the proper context, a factfinder's disbelief of an employer's proffered nondiscriminatory reasons may carry significant weight. The Supreme Court noted that, in a prior decision, the Court "reasoned that it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves, 530 U.S. at 147 (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993)). A factfinder's disbelief of reasons proffered by the defendant-employer, particularly when "accompanied by a suspicion of mendacity," may, "with the elements of the prima facie case," be sufficient to show discrimination. Id. (quoting Hicks, 509 U.S. at 511). A party's dishonesty may be considered as "affirmative evidence of guilt." Id. (quoting Wright v. West, 505 U.S. 277, 296 (1992)). Potentially false (or perjurious) evidence cannot be overlooked or, worse, ignored on summary judgment. With these principles in mind, it follows that a plaintiff is not required to disprove each and every one of a defendant's proffered nondiscriminatory reasons when he or she can cast substantial doubt on all of them because there is evidence suggesting mendacity.[2] Ultimately, the question of whether to draw the necessary inferences to establish the

---

[2] As the Third Circuit stated when addressing a Title VII claim:

> "We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." Fuentes v. Perskie, 32 F.3d 759, 764-65 n.7 (3d Cir. 1994).

claim is for a jury: "Whether the defendant was in fact motivated by discrimination is of course for the finder of fact to decide * * *." Reeves, 530 U.S. at 154 (Ginsberg, J., concurring).[3]

Focusing on the ultimate issue and viewing the evidence as a whole comports with the statute that Bucci seeks to enforce, a factor absent from the majority's analysis. The General Assembly has declared that the policy of Rhode Island is "to foster the employment of all individuals in this state in accordance with their fullest capacities, regardless of their * * * age * * *, and to safeguard their right to obtain and hold employment without such discrimination." Section 28-5-3. Accordingly, an employee need only "demonstrate[] that * * * age * * * was a motivating factor for any employment practice, even though the practice was also motivated by other factors." Section 28-5-7.3 (emphasis added). Thus, even if an employer can prove that an incident of poor work performance by an employee played a part in a termination, if the plaintiff-employee can show that discrimination also was a motivating factor, then a statutory claim exists. See id. Simply querying whether every one of an employer's reasons has been specifically rebutted by the plaintiff's evidence contravenes the statute and is plainly wrong.[4]

---

[3] It is preferable for juries to decide these issues:

"In civil rights or employment discrimination cases, however, where subtle issues of credibility, inferences, and close legal questions may be involved, where issues concerning the 'genuineness' or 'materiality' of facts are frequently intertwined with law, a single district judge may be a less preferable decisionmaker than a jury. Juries are likely to be far more diverse and to bring a broader range of perspectives to bear on the problem." Elizabeth M. Schneider, The Changing Shape of Federal Civil Pretrial Practice: The Disparate Impact on Civil Rights and Employment Discrimination Cases, 158 U. Pa. L. Rev. 517, 542-43 (2010).

[4] I must pause here to note that this Court very recently discussed "the General Assembly's very explicit determination" regarding the necessity of anti-discrimination measures:

"The General Assembly has sounded neither an uncertain nor a muted trumpet in this domain; it has clearly manifested an intent of the highest order to extirpate discrimination in employment in view of its deleterious effect on individuals and

My approach is not a departure from our case law. See Donald and Pardue, 57 N.Y.L. Sch. L. Rev. at 762-63 (advocating for liberal construction of drawing all reasonable inferences in favor of the nonmoving party and noting that it is, arguably, already the standard). It merely places the substantive framework of an employment discrimination case—as adopted by this Court—in the proper context of a summary judgment motion. Therefore, on the third prong of the McDonnell-Douglas framework, the burden on the plaintiff at the summary judgment stage is merely to put forth evidence from which a jury could reasonably conclude that, when viewed as a whole, the employer's decision was motivated at least in part by discrimination.[5] It is in this context, that I proceed to analyze the evidence presented in this case.

## II

### Application of the Standard and the Framework to the Facts

The majority, quite appropriately, begins its discussion of the third prong of the McDonnell-Douglas framework by addressing Bucci's argument that there was evidence of mendacity, based primarily on the glaringly inconsistent testimony of Martin and Mandeville. Martin testified by affidavit that, in conjunction with the warning notice given to Bucci for the forgery incident with the Connecticut Department of Motor Vehicles (the Connecticut incident), "I reviewed Ms. Bucci's employment file for the first time and found there were many previous complaints against her, dating as far back as August 2001." Martin then detailed what he learned

---

on society more generally. * * * The General Assembly specifically and solemnly declared that the FEPA was designed to address 'matter[s] of state concern * * * [which] foment[] domestic strife and unrest * * * and undermine the foundations of a free democratic state.'" Weeks v. 735 Putnam Pike Operations, LLC, No. 2012-356-A., slip op. at 17-18 (R.I., filed Feb. 28, 2014) (quoting G.L. 1956 § 28-5-2).

[5] This formulation does not ignore pretext; viewing the evidence as a whole also includes consideration of the defendant's proffered nondiscriminatory reasons for its action.

- 34 -

from the file in three paragraphs. Martin then attested that "[b]ased on my observations and assessment of Ms. Bucci's work performance <u>and upon my review of her personnel file</u>, Hurd discharged her for the third and final time in November 2006."[6] Mandeville, however, testified in her deposition that no one looked at Bucci's file until after she was terminated.[7] Only one of these witnesses was truthful, and it is not for this Court, or the trial justice on summary judgment, to decide which one.

The majority errs in its conclusion that this striking dichotomy, viewed in the light most favorable to plaintiff and drawing all reasonable inferences from this evidence, does not permit a factfinder to infer that there was "a suspicion of mendacity" regarding Hurd's motivation for firing Bucci. <u>See</u> <u>Barros</u>, 710 A.2d at 685 (noting that the elements of a sufficient <u>prima</u> <u>facie</u> case can "combine with the factfinder's belief that the basis for dismissing the employee was pretextual, particularly if 'accompanied by a suspicion of mendacity,' [thus] the factfinder is

---

[6] Additionally, in its response to interrogatories, defendant stated that "[w]hen Hurd began to consider the possibility of firing Plaintiff, Mr. Martin looked into Plaintiff's file and noticed the previous complaints against Plaintiff."

[7] The following colloquy occurred during Mandeville's deposition:

> "Q. * * * [I]n order to get the [employment] folder, they would have to talk to you right?
> "A. Correct.
> "Q. Who has sought to look at [Bucci's] folder?
> "A. We didn't -- they didn't ask to see the folder until after she was dismissed.
> "Q. Who did?
> "A. Wendy [Bowen] and Al [Martin].
> "* * *
> "Q. Had anyone ever looked at [the folder] before [Bucci] left the third time?
> "A. Before, no.
> "Q. Did you keep them locked?
> "A. Yes.
> "Q. Does anyone else have the key?
> "A. No."

permitted 'to infer the ultimate fact of intentional discrimination'" (quoting Hicks, 509 U.S. at 511 and citing Woodman v. Haemonetics Corp., 51 F.3d 1087, 1092 (1st Cir. 1995))). The majority declares—without citation—that "a mere inconsistency, without more, does not give rise to a suspicion of mendacity." The majority then states that it would be "reasonable to conclude that Martin never reviewed plaintiff's personnel file before he discharged her," but that "it would be inappropriate for this Court to conclude that Martin lied."[8] I agree with the majority that it would be inappropriate for this Court to conclude that Martin lied—that is a question for a factfinder, i.e., a jury. However, a reasonable jury could conclude that Martin's proffered reliance on a personnel file that he never saw was a post-hoc justification and, therefore, mendacious (and arguably perjurious), which infects the credibility of the entire affidavit. Such issues of credibility are not to be resolved on summary judgment. See DeMaio, 59 A.3d at 130 ("The motion justice 'must refrain from weighing the evidence or passing upon issues of credibility.'" (quoting Doe v. Gelineau, 732 A.2d 43, 48 (R.I. 1999))). Because my de novo review requires me to draw an inference in favor of plaintiff, as I believe is required under our law on summary judgment, I continue my analysis with the understanding that a suspicion of mendacity pervades Hurd's purported reasons for terminating Bucci.

Although standing alone, the fact that Martin may have lied about examining Bucci's personnel file may not be sufficient to give rise to an issue of fact as to a motivating factor for age discrimination, I need not reach such an issue in this case because there is a plethora of evidence piled on top of the allegedly mendacious affidavit.[9] First, the very content of the file

[8] I am not willing to overlook this evidence as merely "inconsistent" testimony. Nor do I believe that a justice of the Superior Court, when confronted with testimony that may be untruthful, should do so either.

[9] The majority's orientation toward the evidence at its analogous point of discussion highlights the difference in our analytical viewpoints. After the majority's discussion of mendacity, it

includes complaints against Bucci from 2001 and 2002. However, it is undisputed that Bucci was rehired after those complaints. The fact that Hurd now employs some of the same reasons to fire Bucci that it overlooked when it rehired her suggests that the proffered reasons for firing her in this case were pretextual.

Additionally, Hurd provided numerous inconsistent reasons for terminating Bucci. As noted above, Martin stated that Bucci's termination was "[b]ased on [his] observations and assessment of Ms. Bucci's work performance and upon [his] review of her personnel file," which was locked away. Mandeville, however, wrote on the form submitted to the Department of Labor and Training that the "reason for separation" was that Hurd was "rearranging people's jobs." Mandeville testified that she had never been untruthful on the forms submitted to the Department of Labor. This additional inconsistency, especially when combined with a mendacious affidavit, can be evidence of pretext.

The majority may be correct to say that Hurd could have fired Bucci because of the Connecticut incident. But Hurd chose not to do so. Instead, Hurd issued a written warning in accordance with its personnel policy—the first and only such written warning issued to Bucci during her third stint of employment at Hurd. Earlier that year, Bucci had begun to experience knee problems, resulting in her wearing a brace. The day after the Connecticut incident

continues that "the 2001-02 complaints about Bucci's performance were not the solitary evidence defendant presented to support the termination." In my view, this is the wrong orientation; it slices and dices plaintiff's evidence, which we are supposed to view in the light most favorable to plaintiff and in the context of the entire claim. Additionally, it contravenes the statute, which only requires plaintiff to demonstrate that age "was a motivating factor for any employment practice, even though the practice was also motivated by other factors." Section 28-5-7.3. On summary judgment, the analysis should continue to search for whether plaintiff has raised an issue of fact as to discrimination, not whether one of defendant's listed reasons can survive a piecemeal analysis. See Sullo v. Greenberg, 68 A.3d 404, 407 (R.I. 2013) ("[T]he burden is on the nonmoving party to produce competent evidence that 'prove[s] the existence of a disputed issue of material fact[.]'" (quoting Mutual Development Corp. v. Ward Fisher & Co., 47 A.3d 319, 323 (R.I. 2012))).

occurred, Bucci went on a short medical leave for cataract surgery. Knee and cataract problems are associated with age. Bucci received no additional written warnings after the warning for the Connecticut incident, yet Hurd fired her approximately two months later. This written warning and the two month interval until discharge also undercuts defendants' response to interrogatories which alleged that the Connecticut incident was "the final straw."

Furthermore, Bucci states in her affidavit that she "recall[ed] asking Martin if the reason I was being terminated from Defendants was because of the September warning [for the Connecticut incident]. He said no." Viewing this evidence in the light most favorable to plaintiff, a reasonable jury could infer that Hurd's proffer of the Connecticut incident as the reason for her termination was pretextual and that a real reason was Bucci's age. Alternatively, even if the forgery incident was one of the reasons for firing Bucci, she need only "demonstrate[] that * * * age * * * was a motivating factor for any employment practice, even though the practice was also motivated by other factors." Section 28-5-7.3.

The majority also dismisses the conflicting evidence regarding Bucci's alleged unwillingness to take on additional tasks. Martin's affidavit contends that Bucci was "generally unwilling" to perform additional duties. The plaintiff, however, actually testified that she agreed to at least some of the tasks,[10] but she was unable to do so on her computer because that computer could not be used for anything other than online vehicle registrations. The plaintiff submitted additional evidence from the Department of Motor Vehicles (DMV) that corroborated the DMV's requirement of a dedicated computer for registrations. Bucci went on to say that she would need a second computer to perform the additional tasks, and that "[t]hey were going to be in the process of doing it" before she was fired. Nevertheless, the majority concludes that

---

[10] As quoted in footnote 8 of the majority opinion, regarding billing for wholesale vehicles, plaintiff stated, "I said to [Martin] fine. I've done that before, so I can do it again."

- 38 -

Bucci's deposition testimony did not specifically rebut Martin's allegations that Bucci was unwilling to receive training on the payroll system and generate activity reports on pending transactions. In so doing, the majority fails to see what is really at stake in the greater context of the case: an employer suggesting that an employee refused additional responsibilities, and an employee contending that she was willing but her employer did not provide her with the necessary resources—in this case, an additional computer. In my view of the evidence in the light most favorable to plaintiff, whether Bucci was "generally unwilling" to take on additional responsibilities or instead was actually unable to perform the duties because of her computer system is a question of fact for a jury.

Finally, Hurd did not follow its own termination procedure. In my opinion, the majority's observation that plaintiff is an at-will employee—terminable with or without cause at any time—is a red herring on this issue. A plaintiff's employment status is irrelevant because our law prohibits discrimination no matter the employee's status. See § 28-5-7. As most employees are at-will, the consideration of an employee's at-will status as a factor weighing against discrimination would render the statute meaningless. Although progressive discipline is discretionary in Hurd's employee handbook, here, plaintiff presented evidence that Hurd gives warnings because "[u]sually three warnings [and] you're terminated." The policy itself states that its purpose is to "administer[] equitable and consistent discipline for unsatisfactory conduct in the workplace." This evidence suggests that Hurd typically follows its progressive discipline policy, and therefore, in this case, defendant departed from the company norm. Thus, the violation of a permissive policy may contribute to the mosaic of evidence supporting discrimination, particularly when there is evidence that the policy is usually followed and

actually was followed for two months. It is for a jury—not this Court and not the Superior Court—to decide the weight of this evidence.

Having assessed the evidence discussed above—the suspicion of mendacity resulting from Martin's affidavit, the defendant's inconsistent reasons for termination and evidence of their falsity, and a failure to follow its own employment procedures—and viewing this evidence in the light most favorable to the plaintiff and in the context of the entire claim, a reasonable jury could find that age was a motivating factor in Hurd's decision to fire Bucci. For this reason, it is my opinion that summary judgment should have been denied in this case.

**III**

**Conclusion**

Our procedural rules seek to balance the scales of justice: summary judgment provides a party with an opportunity to terminate litigation before a costly trial, but only if no material facts are genuinely in dispute. The summary judgment standard takes into account the potential cost of a trial to a party facing weak claims, the opposing party's right to a jury's determination of witness credibility, facts, and inferences, and the judiciary's interest in judicial economy. It is my opinion that the majority's approach in this case wrongly tips the scales in favor of employers. An employment discrimination plaintiff's case is strongest when the evidence is viewed as a whole and not parsed into pieces. This results in a tinted view of the evidence that does not comport with the summary judgment standard. When considering the context of the whole claim, the facts and inferences discussed above permit a factfinder to conclude that age was a motivating factor in Hurd's decision to fire Bucci. I make no conclusions about the factual strength of Bucci's claim; it is not for this Court—or the Superior Court—to decide, it is a

question for a jury.  Unfortunately, the majority deprives Bucci of her right to have a jury answer it.  Consequently, I dissent.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**      Carmella Bucci v. Hurd Buick Pontiac GMC Truck, LLC et al.

**CASE NO:**      No. 2011-163-C.A.
(PC 08-231)

**COURT:**      Supreme Court

**DATE OPINION FILED:**  March 4, 2014

**JUSTICES:**      Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**      Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Sarah Taft-Carter

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Patricia E. Andrews, Esq.

For Defendant:  David A. Wollin, Esq.